UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,          )
    Plaintiff,          )
                   )
  v.          ) Civil Action No. 04-10191-DPW
                   )
25 ROYAL ROAD, BROOKLINE,          )
MASSACHUSETTS,          )
    Defendant.          )
_____)
KURT WALTER, and          )
MELISSA WALTER,          )
    Claimants.          )

## UNITED STATES' MEMORANDUM OF LAW
### IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

The United States of America, by its attorney, Michael J. Sullivan, United States Attorney for the District of Massachusetts, respectfully submits this Memorandum of Law in support of its Motion for Partial Summary Judgment in the above-captioned matter. As set forth below, because the United States has sustained its burden to show that 25 Royal Road, Brookline, Massachusetts (the "Defendant Property"), was used, or intended to be used, to facilitate the commission of narcotics violations, it is entitled a finding that the Defendant Property is forfeitable. Additionally, because Claimant Kurt Walter cannot meet his burden of showing that forfeiture of his claimed share of the proceeds of the sale of the Defendant Property constitutes an excessive fine, the United States is entitled to forfeiture of Claimant Kurt Walter's share of the sale proceeds.

## PRIOR PROCEEDINGS

The United States incorporates by reference its Statement of Undisputed Material Facts Pursuant to Local Rule 56.1, filed herewith (the "56.1 Statement").  Fed. R. Civ. P. 10(c).

The United States filed its Complaint for Forfeiture in Rem (the "Complaint") against the Defendant Property on January 27, 2004, on the grounds that the Defendant Property is forfeitable to the United States pursuant to 21 U.S.C. § 881(a)(7) as "real property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of 21 U.S.C. §§ 841, 846, and/or 856."  56.1 Statement ¶¶ 3.  On January 29, 2004, this Court found probable cause for forfeiture of the Defendant Property and issued the forfeiture Warrant and Monition, directing the United States Marshals Service to publish and serve the notice of forfeiture.  Id. ¶ 4.

On February 20, 2004, Steven T. Byer and Paul W. Eysie filed a Notice of Claim as prospective purchasers of the Defendant Property.  Id. ¶ 5.  On February 27, 2004, Melissa Walter filed an Answer and Verified Statement.  Id. ¶ 6.  On March 22, 2004, the parties moved jointly for an order of sale of the Defendant Property, id. ¶ 7, which was granted the next day by the Court. Id. ¶ 7.  The Defendant Property was sold to Byer and Eysie, disposing of their claim, and the proceeds of the sale of the

Defendant Property have been held in interest-bearing accounts pending the conclusion of this forfeiture action.  Id. ¶ 8.

The government then moved for default against the remaining owner to the property, Kurt Walter, on March 23, 2004.  Id. ¶ 9. The Court granted this motion on March 26, 2004, id. ¶ 9, but subsequently allowed Kurt Walter's motion for leave to file a late claim.  Id. ¶ 9.

## FACTS

The Defendant Property was owned by Doris M. Walter until her death on May 16, 2003.  Under Doris Walter's will, the Defendant Property passed in equal parts to her children, Melissa and Kurt Walter.  Id. ¶ 11.  Kurt Walter ("Walter") distributed marijuana consistently over the past twenty years.  Id. ¶ 12. From the year 2000 forward, Walter derived most of his income from the distribution of marijuana.  Id. ¶ 13.  By his own admission, Walter "constantly had a supply of marijuana."  Id. He met with his customers "all over." Id.  He met with them at bookstores, restaurants, Home Depot, parking lots – "there was no set specific place."  Id.

Walter made $30,000 per year from marijuana sales from 2000 through his arrest at the end of 2003.  Id. 15.  Between 2000 and his arrest at the end of 2003, Walter also smoked marijuana every day.  Id. ¶ 16.  Walter did not distinguish between the marijuana

for his own use and that which was for distribution.  <u>Id.</u>

Dan MacAuley ("MacAuley") was a marijuana customer of Walter's from 2000 through 2003.  <u>Id.</u> 17.  MacAuley bought varying amounts of marijuana from Walter; he sometimes bought as little as a quarter pound (113.5 grams) and as much as five pounds at a time.  <u>Id.</u> ¶ 18.  Intercepted telephone calls between MacAuley and Walter show that MacAuley bought marijuana from Walter at the Defendant Property.  <u>Id.</u> ¶ 19.

On August 19, 2003, there was a series of intercepted calls and voice mail messages between Walter and MacAuley indicating that they planned to meet that night.  <u>Id.</u> ¶ 20. In one of these calls, MacAuley explained to Walter that he needed to see Walter that night, but that he didn't have the "paperwork" (money for marijuana).  In another of these calls, Walter told MacAuley, "if you've got a bag, bring it.  You got a duffel (bag), bring it." They agreed to meet the following morning. <u>Id.</u> ¶ 20.

On August 19, 2003, there was a series of intercepted calls and voicemail messages between Walter and Daniel MacAuley indicating that they planned to meet that night.  In one of these calls, MacAuley explained to Walter that he needed to see Walter that night, but that he didn't have the "paperwork" (money for marijuana).  In another of these calls, Walter told MacAuley, "if you've got a bag, bring it.  You got a duffel (bag), bring it."

They agreed to meet the following morning.  Id. ¶ 21.

On the following morning, August 20, 2003, a surveillance agent saw MacAuley and Walter together near the Chinese restaurant in Newton Center that Walter was working to renovate. Walter took a black bag out of the truck that MacAuley had arrived in and brought the bag toward the restaurant.  Walter then took a cardboard box out of his BMW and gave it to MacAuley. MacAuley then drove away. The nature of this transaction, Walter providing MacAuley with marijuana on consignment, was confirmed by a call later in the day, when MacAuley reminded Walter about a loan that MacAuley had made to him in the past.  Walter assured MacAuley that neither of them would cheat the other, and that there was no need to worry.  This was a reference to MacAuley's drug debt to Walter, based on the marijuana that Walter had given him.  The parties then discussed a future transaction.  MacAuley asked Walter if Walter would have "more" for MacAuley as soon as "he" (a customer) called MacAuley.  Walter agreed to give MacAuley "more in a couple of days, but call me as soon as he call(s) you back." Id. ¶ 22.

In a call on August 24, 2003, MacAuley reported to Walter that he "had loads of paperwork and [he was] ready to go" (meaning that he had money and was ready to get more marijuana from Walter).  Walter, apparently surprised by the speed with

which MacAuley had sold the prior marijuana load, asked "again?"
MacAuley responded "it's bad out . . . it's bad out there" (i.e.,
it was difficult to get marijuana).  Walter told MacAuley that he
had "only probably ten or fifteen for ya" (meaning that he only
had a certain quantity of marijuana available for MacAuley), to
hold him over for another week or two.  MacAuley corrected Walter
and told him that this amount would only hold him for a week or
so.  Id. ¶ 23.

In another series of intercepted calls (September 12 to 15,
2003), Walter and MacAuley made arrangements to meet.  On
September 15, 2003, Walter told him he could meet him that day,
but people were showing the house (25 Royal Road, his late
mother's home, which was on the market) so he wouldn't be able to
get in there until later.  MacAuley replied that he "didn't come
prepared" (he did not have the drug proceeds to pay Walter).
Walter told him not to worry about it and that they would figure
it out the following day.  They agreed to meet at Walter's house.
Soon thereafter, agents saw Walter park his car in front of 25
Royal Road, go inside, and come out after a few minutes.  Walter
put an item in his trunk and then drove into the garage at his
apartment building, 30 Gardner Road.  MacAuley later pulled up
outside, went in, and came out less than twenty minutes later
carrying a yellow plastic bag.  Id. ¶ 24.

On September 23, 2003, Kurt Walter called Dan MacAuley. Walter and MacAuley discussed the last time they met in order to give Kurt Walter marijuana proceeds.  Walter asked MacAuley, "When was the last day you met me?"  "Was the last time you met me, right, to give me something, right, what was it?"  MacAuley could not remember, but replied, making reference to delivering marijuana proceeds to Walter, "It was a large one," and that it was at Walter's mother's house in the kitchen (25 Royal Road). Kurt Walter recalled that the day was "8/30."  Kurt Walter also stated, "that was a big one at my mom's" and that he did not see MacAuley again until "9/17."  Kurt Walter stated that he "has all those figures down."  They agreed to meet at 1:30 at the Dunkin' Donuts near Wollaston Boulevard.  Like the majority of the intercepted telephone calls between Kurt Walter and his marijuana associates, in this call Kurt Walter and MacAuley used cryptic language to discuss their marijuana transactions.  In this conversation, Kurt Walter and MacAuley discussed the last time MacCauley met Walter to give him marijuana proceeds.  MacAuley's and Walter's references to "a large one" and "a big one" at Walter's mother's house refer to MacAuley giving Kurt Walter a large amount marijuana proceeds at Kurt Walter's mother's house (25 Royal Road) on August 30.  Id. ¶ 25.

In late October 2003, Walter and MacAuley met to do a deal

before MacAuley then went on to sell some marijuana to one of his customers. In two calls on October 20, 2003, Walter told MacAuley that he had more marijuana for him and they agreed to meet the following day. A call on October 21, 2003 at approximately 3:45 pm indicated that MacAuley was traveling to meet Walter. Surveillance agents saw Walter go to 25 Royal Road and enter the garage there; then, after a short time, Walter drove to the 30 Gardner Road residence and went into the garage. MacAuley arrived in the area and entered 30 Gardner Road empty-handed. About 15 minutes later, MacAuley emerged from the building with a medium to large sized cardboard box over his shoulder, got into his car, and left the area. MacAuley was followed to a Dunkin Donuts in Quincy where he met with an individual identified as Paul Roche. Roche entered MacAuley's vehicle empty-handed, but later exited the vehicle with a large object (covered by a jacket) under his arm. Id. ¶ 26.

On September 3, 2003, Kurt Walter called Francis Duggan, one of his marijuana distributors. During the conversation Kurt Walter indicated that he had to travel to a different location than his mother's house (25 Royal Road) to get marijuana for Duggan. Specifically, Kurt Walter told Duggan he had to "take a ride" because his "mom's house (25 Royal Road) is gone now. You know what I mean?" Duggan indicated that he understood. Kurt

Walter further stated that he didn't have "the way I used to."
Duggan asked Walter to do the best he could, but then said that
he was "dying over here." "I've got nothing to smoke, nothing to
sell. I'm in agony." Kurt Walter told Duggan to "Watch the
phone." Based on information DEA learned through out its
investigation, Kurt Walter and Duggan were discussing obtaining
marijuana for Duggan. Kurt Walter's statement that his "mom's
house is gone now," and that he didn't "have the way I used to,"
refers to how Kurt Walter was unable to use 25 Royal Road as a
stash location for marijuana any longer because it is on the
market for sale. Id. ¶ 27.

On September 20, 2003, Melissa Walter left a voicemail
message on Kurt Walter's phone, stating that she was "at Mum's,"
that is, 25 Royal Road. Melissa Walter informed her brother,
"Listen, we were going through the basement and we found all
these little moist buds of pot. So Kurt, you cannot have pot up
here anymore. You know because the realtor is gonna be coming
through here a lot." She concluded the call by saying "no more
dope and no parties and no hanging out up he[re] anymore." Id.
¶ 28.

In a telephone conversation the following day, September 21,
2003, Melissa Walter reminded her brother that potential buyers
would be visiting 25 Royal Road and told him to remove the

9

evidence of narcotics trafficking.

> MELISSA: I'm, you need to get that digital scale out of Mum's house okay.
>
> KURT: Yeah
>
> MELISSA: And you can't be doing that in the house.
>
> KURT: Melissa that thing has been there for a while.
>
> MELISSA: Well Kurt it was covered with weed. So I don't know how long a while is in your book, okay?
>
> KURT: Yeah
>
> MELISSA: And we wiped it off so.
>
> KURT: Okay
>
> MELISSA: You gotta get that out of there and there was just tons of buds all over the floor
>
> KURT: Okay.

Id. ¶ 29.

Melissa Walter recalled having this conversation with Kurt Walter, and confirmed that she had located a scale with marijuana on it. She dusted off the scale and returned it to its original box and left it for Kurt Walter to pick up. Id. ¶ 30. Kurt Walter did not pick up the scale, and it was located by DEA in their search pursuant to warrant on December 2, 2003. Id. ¶ 31. DEA also found a duffel bag in the basement of 25 Royal Road containing a ziplock bag of 113.2 grams of marijuana. Id.

On September 29, 2003, during a controlled marijuana transaction with a cooperating individual, Kurt Walter stated that he used to keep it (marijuana) at his mother's house (25 Royal Road) but he was no longer able to use the property because the house was on the market.  At the time Kurt Walter made these remarks, 25 Royal Road was, in fact, on the market.  Id. ¶ 32.

Kim Frank ("Frank") was a customer of Kurt Walter from 1997 through 2003, after the death of Doris Walter.  Id. ¶ 33.  She paid Walter about $1,300 per pound of marijuana.  Id. ¶ 34. Frank was, at the time, a long-time friend of Melissa Walter, and an assistant to Doris Walter while she was dying.  Id. ¶ 34.  She bought marijuana from Walter in a number of locations.  Id. ¶ 35. She would meet Walter at his apartment as well as at 25 Royal Road (the Defendant Property).  Id.  When she met him at the Defendant Property, she would call Walter and talk with him, and then when she went to visit Doris Walter, she would say "let's just do this."  Id. ¶ 37.

On two or three occasions, Frank and Walter walked out into the backyard of the Defendant Property, and Walter sold her marijuana in the backyard.  Id. ¶ 38.  On two other occasions, Frank bought marijuana from Walter in the kitchen of the Defendant Property.  Id. ¶ 39.  These transactions occurred while Doris Walter was alive, id. ¶ 40, but Frank believes she may have

11

also bought marijuana from Walter at the Defendant Property after
Doris Walter died.  <u>Id.</u> ¶ 41.  Each transaction was about a pound
of marijuana.  <u>Id.</u> ¶ 42.

Kim Frank had discussions with Melissa Walter about the fact
that Kurt Walter was selling marijuana.  <u>Id.</u> ¶ 43.  Melissa
Walter also told Kim Frank about finding a scale with marijuana
on it at 25 Royal Road (the Defendant Property).  <u>Id.</u>

Kurt Walter admits that he had scales for selling marijuana.
By his own statements, he had more than one scale.  <u>Id.</u> ¶ 44.
He had one electronic scale, and he might have had other scales.
<u>Id.</u> ¶ 45.  The purpose of having a scale, he acknowledges, was to
weigh out marijuana for distribution, <u>id.</u>  ¶ 46, and he kept the
scales  at his storage place and at his residence.  <u>Id</u>. ¶ 47.
The scale found at 25 Royal Road was an electronic scale.  <u>Id</u>.
¶ 46.

Walter does not recall the following things:
a.   whether there were any days between 2000 and 2003 when
     he did not smoke marijuana
b.   The names of any of his customers for marijuana
c.   how many customers he had, although it was "a fairly
     good amount"
d.   how much he sold marijuana to Dan MacAuley for
e.   when he started buying marijuana from co-defendant
     Douglas Bannerman
f.   what his own cell phone number was when he dealt with
     Bannerman
g.   whether he used the word paperwork to refer to

marijuana proceeds

h.  whether he used "schedule" or "hours" as code to refer to marijuana

i.  where Bannerman's office was

j.  whether he negotiated with Bannerman about price

k.  whether Bannerman ever sold him cocaine

l.  whether he himself ever sold cocaine

m.  when he first moved to the apartment at 30 Gardner Road

n.  when he first rented the storage unit that he claims is the only location he ever stored marijuana in

o.  the name of the storage company that he used for storing the marijuana from at least 2000 forward

p.  the name of the storage unit that he used for storing the marijuana from at least 2000 forward

q.  the name of the street where the storage unit was that he used for storing the marijuana from at least 2000 forward

r.  how often his former business partner, John McCarthy, bought marijuana from him

s.  how much marijuana he hid in the storage unit at any given time

t.  how many scales he had for weighing marijuana

u.  whether John McCarthy bought marijuana on credit

v.  whether he got upset with customers for not paying on time

w.  how much marijuana he smoked at 25 Royal Road at any given time

x.  whether he was using more cocaine after his mother's death

y.  what friends he invited to his mother's home after her death

z.  whether other people smoked marijuana at his mother's home after his death

aa. whether he smoked marijuana in front of other people at

his mother's home after her death

bb.  whether he left a bag of marijuana at his mother's house

cc.  whether his sister called about marijuana he left at 25 Royal Road (his mother's house)

dd.  with reference to the marijuana that his sister may have called him about leaving at their mother's house, whether he got it out or threw it away

ee.  with reference to the marijuana that his sister may have called him about leaving at their mother's house, how much marijuana it was

ff.  with reference to the marijuana that his sister may have called him about leaving at their mother's house, whether she called him a second time.

<u>Id</u>. at ¶ 48.

**ARGUMENT**

**A.   Summary Judgment Standard.**

Summary judgment is appropriate in civil forfeiture cases where, as here, "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c); <u>Gaskell v. Harvard Cooperative Society</u>, 3 F.3d 495, 497 (1st Cir. 1993); <u>United States v. One Parcel of Real Property</u>, 900 F.2d 470, 473 (1st Cir. 1990) (affirming grant of summary judgment in civil forfeiture action where there were no genuine issues of material fact).  When a party moving for summary judgment demonstrates that there is an absence of evidence to support the nonmoving party's position, "the burden shifts to the nonmoving party to

14

establish the existence of an issue of fact that could affect the outcome of the litigation and from which a reasonable jury could find for the opponent." Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990).

The question at summary judgment whether there exists a "genuine" issue of fact. A mere scintilla of evidence is insufficient to defeat a properly supported motion for summary judgment. Tower v. Leslie-Brown, 326 F.3d 290, 297 (1st Cir. 2003) (quoting with approval Torres v. E.I. Dupont de Nemours & Co., 219 F.3d 13, 18 (1st Cir. 2000)). The standard is the same as for a directed verdict. If a reasonable fact finder could only come to one conclusion, the moving party is entitled to judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Katz v. City Metal Co., 87 F.3d 26, 28 (1st Cir. 1996).

**B.    Burden Of Proof.**

The government asserts that the Defendant Property is forfeitable under 21 U.S.C. § 881(a)(7), which provides that the following shall be subject to forfeiture to the United States:

> All real property, including any right, title, and interest
> (including any leasehold interest) in the whole of any lot
> or tract of land and any appurtenances or improvements,
> which is used, or intended to be used, in any manner or
> part, to commit, or to facilitate the commission of, a
> violation of this title punishable by more than one year's
> imprisonment.

To prevail in a forfeiture action under Section 881(a), the

United States must establish, by a preponderance of the evidence, that the Defendant Property is subject to forfeiture. 18 U.S.C. § 983(c)(1).

Where, as here, the government's theory of forfeiture is that the Defendant Property was used to facilitate a crime, the government must establish a "substantial connection" between the Defendant Property and the offense. 18 U.S.C. § 983(c)(3); One Parcel of Real Property, 900 F.2d at 474. The "substantial connection" test requires only that the property was used, or intended to be used, to commit a crime, or facilitated the commission of a crime. United States v. Schifferli, 895 F.2d 987, 990 (4th Cir. 1990).[1] Real property may be forfeited if it had "more than 'an incidental or fortuitous connection'" to criminal activity. United States v. One Lot of U.S. Currency ($36,634), 103 F.3d 1048, 1055 (1st Cir. 1997) (quoting United States v. 1933 Commonwealth Avenue, Newton, Massachusetts, 913

---

[1] Section 983(c)(3) was enacted as part of the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), Pub. L. No. 106-185, 114 Stat. 202 (2000). Yet even prior to CAFRA, most courts, including the First Circuit, applied the "substantial connection" test to forfeitures of facilitating property. See, e.g., One Parcel of Real Property, 900 F.2d at 474; United States v. One 1986 Ford Pickup, 56 F.3d 1181 (9th Cir. 1995); United States v. Borromeo, 995 F.2d 23 (4th Cir. 1993); United States v. Real Property and Residence at 3097 S.W. 111th Avenue, 921 F.2d 1551 (11th Cir. 1991); United States v. Twelve Thousand Five Hundred and Eighty Five Dollars, 869 F.2d 1093 (8th Cir. 1989).

F.2d 1, 3 (1st Cir. 1990)).  See also Schifferli, 895 F.2d at 990.

While CAFRA changed the United States' burden of proof regarding forfeitability from probable cause to preponderance of the evidence, CAFRA in no way precludes the grant of summary judgment in civil forfeiture proceedings.  See House Passage of H.R. 1658, Floor Statements, 146 Cong. Rec. H2040-01, 2000 WL 368969 (Cong. Rec.), Proceedings and Debates of the 106th Congress, Second Session, Tuesday, April 11, 2000 ("This bill is not intended to limit the right of either party to bring a motion for summary judgment after the filing of the complaint pursuant to Fed. R. Civ. P. 56(a) or 56(b).").

**C.   The Evidence Establishes That
       The Defendant Property Is Forfeitable.**

Under First Circuit law, there is a substantial connection between real estate and drug trafficking, for purposes of 21 U.S.C. § 881(a)(7), if drug transactions take place in the real estate.  For example, in United States v. Desmarias, 938 F.2d 347, 353 (1st Cir. 1991), the First Circuit found that there was a substantial connection to a residence sufficient to support its forfeiture under 21 U.S.C. § 853(a), the criminal analogue to Section 881(a)(7), where the owner of the residence had accepted the controlled delivery of an express mail package of marijuana at the residence, and a search of the residence revealed the

marijuana, 19 grams of hashish, and a triple beam scale. <u>Id.</u> at
349, 353. The Court noted that *either* the fact that the package
was addressed to the residence or the fact that controlled
substances and a scale were found during a search of the
residence was sufficient to establish a "substantial connection"
between the residence and the commission of the substantive
offense. <u>Id.</u> (emphasis in original).

Here, the evidence likewise establishes a substantial
connection between the Defendant Property and the illegal conduct
committed by Kurt Walter. The undisputed evidence is that Kurt
Walter had an electronic scale with marijuana residue at the
Defendant Property, 56.1 Statement ¶ 31, and that he used scales
to weigh drugs to distribute to marijuana customers. <u>Id</u>. at 44.
The undisputed evidence is that Kurt Walter had a quarter pound
of marijuana at the Defendant Property at the time of the DEA
search. <u>Id</u>. at 31. He distributed in amounts as small as a
quarter pound, and he did not distinguish his own "personal use"
marijuana from the marijuana he distributed. <u>Id</u>. at 18, 16.
Therefore, there is a substantial connection between the
Defendant Property and the substantive offenses of conviction,
conspiring to distribute and distributing marijuana.

Moreover, in the instant case, there is a substantially
greater connection to the Defendant Property, because it is

beyond dispute that Walter was using the property as a stash house.  In a consensually recorded meeting on September 29, 2003, surveilled by DEA agents, Walter is taped telling a cooperating witness that he had to move his marijuana stash location from his mother's house since her house was on the market.  56.1 Statement ¶ 32.  Additionally, DEA agents listening to Walter on telephone intercepts on two occasions heard him set up a marijuana deal, set a time to meet a customer, and then stop by the Defendant Property in advance of meeting the customer.  <u>Id</u>. at 24 & 26.

There is also significant evidence that Walter actually distributed out of the Defendant Property.  By his own admission, he met with his customers "all over."  <u>Id</u>. at 14.  He met with them at bookstores, restaurants, Home Depot, parking lots – "there was no set specific place."  <u>Id</u>.  Customer Kim Frank testified that she had purchased marijuana in one pound quantities from Kurt Walter at least two times in the kitchen at the Defendant Property, and at least one other time at the outside of the house.  <u>Id.</u> at 39, 38.  From this evidence, the connection between Walter's crimes and the Defendant Property is simply overwhelming.

Kurt Walter generally denies the latter evidence that he stored and distributed marijuana out of the Defendant Property. He does not provide any substantive explanation for what he was

doing on those occasions.  He simply asserts that he knows that
he never sold marijuana at his mother's house, even after her
death, out of respect for her.  While this is a nice sentiment,
the government respectfully submits that in light of the
evidence, Walter's statements do not constitute a genuine factual
issue.  Walter admits that he was a drug dealer; he admits that
the persons surveilled by DEA in the course of what appeared to
be drug transactions were his drug customers; he admits that Kim
Frank, the woman who claimed that Walter sold her marijuana at
his mother's kitchen table was in fact his drug customer.  And he
admits that he met his customers "all over."  Given these facts,
his self-serving denial of the connection to 25 Royal Road,
especially in light of his complete inability to recall with
certainty virtually anything else from the prior five years, <u>Id</u>.
at 48, is simply not plausible under any standard, and is
therefore not sufficient to withstand summary judgment.

**D.    Forfeiture Of One-Half Of The Proceeds
        Of The Sale Of The Defendant Property
        <u>Cannot Violate The Excessive Fines Clause.</u>**

        In addition to challenging the forfeitability of the
Defendant Property, Walter asserted that the forfeiture of the
Defendant Property would constitute an excessive fine under the
Eight Amendment.  Docket 2.  Because the forfeiture of one-half
of the proceeds of the sale of the Defendant Property could not

possibly be considered an excessive fine, the government is
entitled to forfeiture of Walter's claimed interest in the
Defendant Property.

An in rem forfeiture will violate the excessive fines clause
of the Eighth Amendment only if it is "grossly disproportional"
to the gravity of the underlying criminal offense.  Austin v.
United States, 509 U.S. 602 (1993); United States v. 45 Claremont
Street, 395 F.3d 1, 6 (1st Cir. 2004); see also United States v.
Heldeman, 402 F.3d 220, 223 (1st Cir. 2005).  In determining the
proportionality of a forfeiture under the Eighth Amendment,
courts examine whether the offense is related to other illegal
activities, the potential penalties for the offense, and the harm
caused by the offense.  45 Claremont Street, 395 F.3d at 6
(citing United States v. Bajakajian, 524 U.S. 321, 337-340
(1998).

Walter's share of the proceeds from the sale of the
Defendant Property is approximately $361,383.70, one half of the
value of the proceeds.  See 56.1 Statement ¶ 11.  Walter
committed the crimes subjecting the Defendant Property to
forfeiture.  Walter is a convicted drug trafficker, who made the
greater part of his income over the past 20 years from drug
dealing.  Walter was subject to a potential fine of $5,750,000
pursuant to 21 U.S.C. § 841(b)(1) and 18 U.S.C. § 3571(b) for the

21

crimes to which he pled guilty.[2]  This potential fine is approximately 16 times the value of the amount of his claim. Clearly the harshness of this forfeiture is not grossly disproportional to Walter's offenses.  See 45 Claremont Street, 395 F.2d at 6 (forfeiture of home with $200,000 in equity, in which claimant and her four children lived, was not excessive fine; claimant was involved in underlying drug transactions, value of drugs was more than $1 million, and penalty for crime included fine up to $4 million).  Because Walter cannot possibly establish that forfeiture of his share is an excessive fine, the United States is entitled to forfeiture of his share of the proceeds of the sale of the Defendant Property.

### CONCLUSION

The indisputable evidence shows that the Defendant Property was used to commit and facilitate a felony violation of Title 21 which carries a sentence of up to forty years' imprisonment.  The government has met the substantial connection test by showing that Walter distributed marijuana from the Defendant Property.  A more straightforward case of forfeiture is hard to imagine.

WHEREFORE, it is respectfully submitted that there are no

---

[2]  In the instant case, the statutory maximum fine is also the Guideline maximum fine. See USSG § 5E1.2(c)(4) (setting the maximum Guideline fine as the statutory maximum where the statutory maximum exceeds $250,000).

material facts in dispute and that the United States is entitled

to summary judgment.

                                  Respectfully submitted,

                                  MICHAEL J. SULLIVAN
                                  United States Attorney


                           By:   /s/ Nancy Rue
                                  KRISTINA E. BARCLAY
                                  NANCY RUE
                                  Assistant U.S. Attorney
                                  United States Courthouse
                                  One Courthouse Way
                                  Suite 9200
                                  Boston, Massachusetts 02210
Dated: October 27, 2006           (617)748-3100


                    CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system
will be sent electronically to the registered participants as
identified on the Notice of Electronic Filing (NEF).

                           /s/ Nancy Rue
                           Nancy Rue
                           Assistant United States Attorney

Date:      October 27, 2006