```
                                                              1

                                                         1 - 86


              IN THE UNITED STATES DISTRICT COURT

                          FOR THE

                   DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,        )
                                 )
              Plaintiff,         )
                                 )
vs.                              )  CIVIL ACTION NO.
                                 )  04-10191-DPW
25 ROYAL ROAD,                   )
                                 )
BROOKLINE, MASSACHUSETTS,        )
                                 )
              Defendant,         )
                                 )
KURT WALTER and MELISSA WALTER,  )
                                 )
              Claimants.         )
```

THE ORAL DEPOSITION OF KIMBERLEY A. FRANK, held pursuant to Notice, and the applicable provisions of the Federal Rules of Civil Procedure, before MaryAnn Rossi, a Court Reporter and Notary Public, within and for the Commonwealth of Massachusetts, at the offices of the United States Attorney, 1 Courthouse Way, Suite 9200, Boston, Massachusetts, on Tuesday, June 27, 2006, commencing at 11:36 o'clock a.m.

**ORIGINAL**

*APEX Reporting*
(617) 426-3077

APPEARANCES:

On Behalf of the Plaintiff:

JENNIFER H. ZACKS, ESQ.
Assistant United States Attorney
Office of the United States Attorney
1 Courthouse Way
Suite 9200
Boston, MA  02210
(617) 748-3100

On Behalf of the Witness:

RICHARD GOLDSTEIN, ESQ.
Donoghue, Barrett & Singal, P.C.
One Beacon Street
Suite 1320
Boston, MA  02108-3113
(617) 720-5090

On Behalf of the Claimant, Melissa Walter:

PETER B. KRUPP, ESQ.
Lurie and Krupp
One McKinley Square
Boston, MA  02109
(617) 367-1971

On Behalf of the Claimant, Kurt Walter:

WILLIAM J. CINTOLO, ESQ.
Cosgrove, Eisenberg & Kiley
One International Place
Suite 1820
Boston, MA  02110
(617) 439-7775

Also Present:

NICOLE SWIEC, Paralegal

1  would you say that you had -- that you knew that had AIDS
2  that you were selling marijuana to?
3     A    A couple.
4     Q    Okay, a couple.  Like two?  Three?
5     A    Yes.
6     Q    All right.  Now, what quantities -- Once -- You said
7  you started selling it about in say 1999?  Would that be
8  fair to say approximately?
9     A    Approximately.
10    Q    What quantities -- Was Kurt Walter still your only
11 source for purchasing marijuana at that time?
12    A    At that time, yes.
13    Q    What quantities would you say you purchased from
14 Kurt Walter?  And you can -- At different time periods?
15    A    Between like a half a pound and a pound.  That was
16 it.  About four times a year.
17    Q    Okay.  So, you'd purchase about half a pound to a
18 pound of marijuana from Kurt Walter about four times a year?
19    A    Correct.
20    Q    And then, you would -- And that began in
21 approximately 1997?  And that went on until when?
22    A    No.  You -- '99 you just said.
23    Q    I'm sorry.  That began in -- Okay.  You first
24 started purchasing marijuana, not for sale, just for your
25 own use, from Kurt Walter in approximately 1997; is that

```
 1   correct?
 2       A     Correct.
 3       Q     Then, later on, you began -- approximately 1999, you
 4   began purchasing larger quantities; is that correct?
 5       A     Yes.
 6       Q     For sale to other people?
 7       A     Right.
 8       Q     Also from Kurt Walter?
 9       A     But, he said that he knew where he could get it.
10   I -- I -- And that's how -- I didn't know all of this was
11   happening, so--
12       Q     When you say you didn't know all this was happening,
13   what do you mean?
14       A     I just assumed or thought that it was just small
15   quantities.  I -- And now it's escalated into something
16   huge.
17       Q     Okay.  So, -- So, when you were purchasing
18   marijuana, starting in 1999 from Kurt Walter, you said you
19   purchased about a pound or a half a pound at a time?
20       A     Correct.
21       Q     So, how much -- how much did that -- did the
22   marijuana cost per pound?  About approximately?
23       A     Maybe $1300.
24       Q     $1300 a pound?  Is that what you said?
25       A     I -- I think so.
```

1  Q    And when you--
2  A    Honestly, I -- I don't know the exact dollars right
3  now.
4  Q    Okay. But 13 -- 1300 is about right approximately?
5  A    Yes.
6  Q    All right. Now, what quantities of marijuana were
7  you selling to other people?
8  A    A quarter of an ounce, half an ounce.
9  Q    Okay. And how much -- A quarter of an ounce, half
10 an ounce.
11       And how much would you charge for that
12 approximately?
13 A    A hundred dollars.
14 Q    So, a hundred dollars for a quarter ounce or a
15 hundred dollars for a half an ounce?
16 A    I don't remember.
17 Q    So, you began -- All right. So, you began
18 purchasing marijuana from Kurt Walter in about 1997, 1998?
19 And that continued until when?
20 A    The -- Until about shortly after Doris died. I
21 believe, I got -- Well, I know I got in touch with him one -
22 - one more time after Doris' death.
23 Q    Okay. And when you say you "got in touch with him",
24 you mean, you -- What do you mean by that?
25 A    I -- Since I've been back, I always called to check

```
 1    A      That's why I'm here.
 2    Q      I'm just asking--
 3    A      I know.  I'm sorry.
 4    Q      All right.  So, looking at this conversation, what -
 5  - what did you understand two pairs to mean?
 6    A      Two bags of pot.
 7    Q      Two -- When you say "bag", how much was a bag?
 8    A      A half pound.
 9    Q      Okay.  So, when you say two bags, you were talking
10  about a pound of marijuana?
11    A      Yes.
12    Q      Do you need to take a break?
13    A      (No verbal response.)
14    Q      That's no?
15    A      Yes.  No.
16    Q      No, you don't need to take a break.
17           MR. GOLDSTEIN:  I think the witness is indicating
18  she would like to, you know, continue the deposition.
19           Do you want more water?
20           THE WITNESS:  Yeah.
21           MS. ZACKS:  Is there no water left?
22           THE WITNESS:  No, there is.  It's okay.
23           MR. GOLDSTEIN:  It will be my job to keep the water
24  glasses full.
25           BY MS. ZACKS:
```

40

```
 1    Q    Okay.  Now, when you -- when you purchased marijuana
 2  from Kurt Walter, how was it packaged?
 3    A    In a Ziploc bag.
 4    Q    So, was it in one Ziploc bag or many Ziploc bags?
 5    A    One.
 6    Q    And all of the marijuana being purchased from him
 7  was always in the Ziploc bags when you got it?
 8    A    Yes.
 9    Q    Where -- Did -- Did Kurt Walter tell you -- ever
10  tell you where he stored his marijuana?
11    A    Never.
12    Q    Never?
13    A    Never.
14    Q    Okay.  Where did you go to pick up the marijuana
15  from him?
16    A    Sometimes, it would be out in the backyard.
17  Sometimes, I would meet him in various places.  And
18  sometimes, at his apartment.  More so at his apartment.
19         And sometimes at Doris' house.
20    Q    When you say -- The first place you said was in the
21  backyard.
22         What backyard are you referring to there?
23    A    And back of their house, they have a backyard.
24    Q    When you say "their house", you mean 25 Royal Road?
25    A    Yes.
```

41

1   Q      Okay.  Where -- So, where in the backyard would that
2   be?
3   A      In the backyard.
4   Q      Okay.  Where--
5   A      I -- I--
6   Q      Did you -- Did -- Did Kurt Walter meet you in the
7   backyard?
8   A      Well, we -- Yeah, I guess.  Yes, would be the
9   answer
10  Q      Okay.  Where did he -- Did he have the marijuana
11  with you when he met you in the backyard of 25 Royal Road?
12  A      Yes.
13  Q      Okay.  Did -- You didn't see where he got it from?
14  Did he come out of the house with the marijuana?
15  A      Don't know.
16  Q      Okay.  You would just -- You just show up at 25
17  Royal Road and he would be -- and Kurt Walter would be
18  standing in the backyard of 25 Royal Road?
19  A      No.  We had conversations to meet, yes.
20  Q      Okay.  And when -- So, you'd have a conversation to
21  meet?
22  A      Correct.
23  Q      You'd drive over to 25 Royal Road?
24  A      Correct.
25  Q      And when you got there, Kurt Walter would be

APEX Reporting
(617) 426-3077

```
 1  standing in the backyard with the marijuana?
 2   A    No.  We would have -- We'd have a chat.  I go to
 3  visit Doris.
 4        And then, you know, we would say:  "All right.  So,
 5  let's just do this."  And that's when I would go out and he
 6  would meet me there.
 7   Q    Okay.  So, you would first -- first you would go in
 8  the house at 25 Royal Road.  And you'd say something like:
 9  "Let's go do this"?
10   A    Right.
11   Q    Then, you'd both -- then you'd go out to the
12  backyard.  And then, he would -- Kurt Walter would come out
13  to the backyard of 25 Royal Road?
14   A    That only -- It only happened like twice or three
15  times.
16   Q    Okay.  So, twice or three times you met in the
17  backyard--
18   A    Yes.
19   Q    -- of 25 Royal Road and Kurt Walter sold you
20  marijuana there?
21   A    Yes.
22   Q    Okay.  All right.  Okay.  And you said some of the
23  other places were at his apartment?
24   A    Yes.
25   Q    Where was the apartment located?
```

43

```
 1    A    I don't know the name of the street.  I want to say
 2  University Road, but that's not -- I don't think that's the
 3  right road.
 4    Q    Okay.  All right.  And you said some of the
 5  purchases were actually inside the house at 25 Royal Road?
 6    A    No.  At his apartment, yes.
 7    Q    Okay.  All right.  So none -- You never made --
 8  purchased--
 9    A    Twice.
10    Q    When you say "twice"--
11    A    In the house.
12    Q    In the house.  Where in the house?
13    A    Kitchen table when his mom was out.  It was never
14  done in front of Doris.
15    Q    Okay.  So, he never did these transactions in front
16  of Doris Walter?
17    A    No.
18    Q    Now, were these -- You were talking about Doris.
19         Were these transactions all before Doris Walter
20  died?  Or were some after?
21         MR. GOLDSTEIN:  What transactions are you referring
22  to?
23         MS. ZACKS:  These ones.  In the -- in the kitchen at
24  25 Royal Road.
25    A    She was alive.
```

APEX Reporting
(617) 426-3077

44

```
 1         BY MS. ZACKS:
 2    Q    There were no -- Now, there were no transactions,
 3　marijuana deals, with Kurt Walter at 25 Royal Road after
 4　Doris Walter's death?
 5    A    I believe -- I don't remember, but I don't think so.
 6    Q    Are you sure of that?
 7    A    No.  I'm not.  That's why I said I don't think so.
 8         I know he had his apartment.  And I -- I can't be
 9　sure.
10    Q    So, you're not exactly sure when these marijuana
11　transactions took place?  Whether they were--
12    A    Not -- I know that I purchased marijuana when he was
13　living at the house.  We just discussed that.
14         And then, I'm not sure what your question is.  I'm
15　sorry.
16    Q    Okay.  I'm just trying to get a time frame for
17　when -- when these marijuana purchases to place.
18         Was it -- Were they -- And we're trying to see --
19　and whether they were before or after Doris Walter's death.
20
21         And you're saying you're not sure whether some of
22　them were before her death or some were after her death?
23　Are you sure that they all took place before?  Are you sure
24　that--
25    A    No.  Some were--
```

```
 1            MR. CINTOLO:  Objection to the form.
 2            MR. KRUPP:  Objection to the form.
 3            MR. CINTOLO:  By the way, with regard to objections,
 4   I'm assuming that either one of us objects, the other one is
 5   automatically joined in there.
 6            MR. KRUPP:  That's routine for trial.
 7            MS. ZACKS:  Objections as to form are fine.
 8            BY MS. ZACKS:
 9       Q    Okay.  So when -- So, when did these transactions
10   occur?  Are you not sure?
11       A    Some were--
12            MR. KRUPP:  Objection as to form.
13       A    Some were while Doris is alive.  And there may have
14   been one -- one more after she died.
15            BY MS. ZACKS:
16       Q    Okay.  But you're not sure?
17       A    I'm not.
18       Q    Okay.  All right.  So, you're -- Now, you said that
19   a couple of the marijuana transactions with Kurt Walter did
20   occur inside 25 Royal Road in the kitchen; is that right?
21       A    Yes.
22       Q    Do you remember how much those were -- how much
23   marijuana you purchased at that time?
24       A    It was the same.  A pound.
25       Q    The same?  A pound or a half a pound?
```

1    A    Correct.
2    Q    Okay. All right. Now, at that time, did -- that
3 Kurt Walter was selling you marijuana, so, we're saying
4 starting in 1997, 1998, and continuing until some time in
5 2003? Is that fair to say?
6    A    Ish, yes.
7    Q    Did you know if he was also -- if he was using
8 marijuana?
9    A    No. I -- Well, yet always said that he doesn't like
10 it.
11    Q    Okay. So, he told you he didn't like marijuana?
12    A    I'm sure he had smoked it. But not as regular as
13 myself.
14    Q    Okay. And when you say as regular as yourself, you
15 were, during that time period, we're talking 1997, '98 to
16 2003, you used approximately a couple of joints a week?
17    A    Correct.
18    Q    And Kurt Walter told you he didn't like marijuana?
19    A    Didn't do it like I did it.
20    Q    Okay. So, Kurt Walter told you he didn't smoke a
21 couple of joints a week?
22    A    Say it again?
23    Q    He said he didn't smoke the quantity you smoked?
24    A    Correct.
25    Q    So, he didn't smoke a couple of joints?

60

1  you talk with her about it?
2           MR. KRUPP:  Asked and answered.
3     A     At some point, probably, yes.
4           BY MS. ZACKS:
5     Q     How did that conversation go?
6     A     I don't remember the physical conversation per se.
7     Q     Okay.  When you say "doing something with marijuana
8  at his apartment", what do you mean by that?
9     A     Probably selling it.
10    Q     So, what you're saying is, and correct me if I'm
11 getting this wrong, that Melissa Walter knew that Kurt
12 Walter was selling marijuana using his apartment?
13    A     That would be fair to say.
14    Q     Okay.  And you knew that because you spoke with her
15 about it?
16          MR. KRUPP:  Objection.
17    A     No.  I know that because she had been in his
18 apartment.
19          And I guess, we did have a conversation at some
20 point.  But I don't remember the exact time or date or, you
21 know, how that conversation went down.
22          It wasn't like:  "Okay.  So, this is the" -- It was
23 like that.  So,--
24          BY MS. ZACKS:
25    Q     Okay.  You said she'd been in his apartment.

```
 1   describe the conversation?  Did you talk to Melissa about
 2   her finding -- Did you have a conversation with her about
 3   her finding a scale at 25 Royal Road?
 4           MR. KRUPP:  Objection to the form.
 5   A   Yes.  When she was cleaning out her mom's house,
 6   after the death of Doris, that's when she found it.  And she
 7   got very upset.
 8           And that is when she told me that she had found that
 9   in the house and she was very upset.
10           BY MS. ZACKS:
11   Q   Okay.  What -- What -- Did she call you?  Did she--
12   A   But we -- You know, when we were friends, we'd speak
13   daily.  So, you know, and a lot has happened through all of
14   this.  So,--
15   Q   Well, focusing on that conversation about the scale,
16   what do you remember about that conversation?
17   A   I remember her saying that she was pissed and that
18   she wants to show the house, and this needs to go -- get out
19   of the house.  And she was just really mad that it was even
20   in the house.
21   Q   Do you know why she was telling you this?
22   A   Venting, that's what friends do.
23   Q   Okay.  All right.  And did you know -- did she know
24   who the scale belonged to?
25   A   Yes.  She called Kurt.
```

85

CORRECTION SHEET

DEPOSITION OF KIMBERLEY ANN FRANK

PAGE NO.      LINE NO.     SUGGESTED CORRECTION

_____        _____       _____

_____        _____       _____

_____        _____       _____

_____        _____       _____

_____        _____       _____

_____        _____       _____

_____        _____       _____

_____        _____       _____

_____        _____       _____

_____        _____       _____

_____        _____       _____

_____        _____       _____

_____        _____       _____

_____        _____       _____

_____        _____       _____

_____        _____       _____

_____        _____       _____

_____        _____       _____

*APEX Reporting*
(617) 426-3077

86

SIGNATURE OF WITNESS:

    I have read the foregoing transcript and the same contains a true and accurate recording of my answers to the questions therein set forth, subject to the change and/or correction sheet(s) attached.


_____
Deponent