```
                   UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,     )
            Plaintiff,        )
                              )
    v.                        ) Civil Action No. 04-10191-DPW
                              )
25 ROYAL ROAD, BROOKLINE,     )
MASSACHUSETTS,                )
            Defendant.        )
_____)
KURT WALTER,                  )
            Claimant.         )
```

**UNITED STATES' TRIAL MEMORANDUM**

The plaintiff, United States of America, respectfully submits this Trial Memorandum pursuant to the Court's Order Regulating Non-Jury Trial.

Pursuant to Paragraph 3(c) of the Court's Order, the government tenders herewith its Proposed Findings of Fact and Conclusions of Law, as Exhibit A to this Memorandum. The government served these Proposed Findings on counsel for Claimant on July 9, 2007 and has received no marked response.

**I.   FACTS**

The defendant in the above-captioned case is the real property located at 25 Royal Road, Brookline, Massachusetts (the "Defendant Property"). The Defendant Property was owned by Doris M. Walter until her death on May 16, 2003. Under Doris Walter's will, the Defendant Property passed in equal parts to her

children, Melissa and Kurt Walter.

Kurt Walter ("Walter") distributed marijuana consistently over the past twenty years.  Walter used the defendant property to distribute and store marijuana.  From the year 2000 forward, Walter derived most of his income from the distribution of marijuana.  Walter "constantly had a supply of marijuana."  He met with his customers "all over."  He met with them at bookstores, restaurants, Home Depot, parking lots – "there was no set specific place."  Walter made about $30,000 per year from marijuana sales from 2000 through his arrest at the end of 2003.  Between 2000 and his arrest at the end of 2003, Walter also smoked marijuana every day.  Walter did not distinguish between the marijuana for his own use and that which was for distribution.

Dan MacAuley ("MacAuley") was a marijuana customer of Walter's from 2000 through 2003.  MacAuley bought varying amounts of marijuana from Walter.  MacAuley sometimes bought as little as a quarter pound (113.5 grams) from Walter.  Other times, he bought as much as five pounds at a time.  A wiretap authorized by a federal court on Walter's telephone produced tape recordings of telephone calls between Walter and MacAuley regarding marijuana sales.

On August 19, 2003, there was a series of intercepted calls

and voice mail messages between Walter and MacAuley indicating that they planned to meet that night. In one of these calls, MacAuley explained to Walter that he needed to see Walter that night, but that he didn't have the "paperwork" (money for marijuana). In another of these calls, Walter told MacAuley, "if you've got a bag, bring it. You got a duffel (bag), bring it." They agreed to meet the following morning.

On the following morning, August 20, 2003, a surveillance agent saw MacAuley and Walter together near the Chinese restaurant in Newton Center that Walter was working to renovate. Walter took a black bag out of the truck that MacAuley had arrived in and brought the bag toward the restaurant. Walter then took a cardboard box out of his BMW and gave it to MacAuley. MacAuley then drove away. The nature of this transaction, Walter providing MacAuley with marijuana on consignment, was confirmed by a call later in the day, when MacAuley reminded Walter about a loan that MacAuley had made to him in the past. Walter assured MacAuley that neither of them would cheat the other, and that there was no need to worry. This was a reference to MacAuley's drug debt to Walter, based on the marijuana that Walter had given him. The parties then discussed a future transaction. MacAuley asked Walter if Walter would have "more" for MacAuley as soon as "he" (a customer) called MacAuley. Walter agreed to give

MacAuley "more in a couple of days, but call me as soon as he call(s) you back."

A few days later, MacAuley and Walter again spoke by telephone. In a call on August 24, 2003, MacAuley reported to Walter that he "had loads of paperwork and [he was] ready to go" (meaning that he had money and was ready to get more marijuana from Walter). Walter, apparently surprised by the speed with which MacAuley had sold the prior marijuana load, asked "again?" MacAuley responded "it's bad out . . . it's bad out there" (i.e., it was difficult to get marijuana). Walter told MacAuley that he had "only probably ten or fifteen for ya" (meaning that he only had a certain quantity of marijuana available for MacAuley), to hold him over for another week or two. MacAuley corrected Walter and told him that this amount would only hold him for a week or so.

Intercepted telephone calls between MacAuley and Walter show that MacAuley bought marijuana from Walter at the Defendant Property. In a series of intercepted calls during the period September 12 to 15, 2003, Walter and MacAuley made arrangements to meet. On September 15, 2003, Walter told him he could meet him that day, but people were showing the house (25 Royal Road, his late mother's home, which was on the market) so he wouldn't be able to get in there until later. MacAuley replied that he

"didn't come prepared" (he did not have the drug proceeds to pay Walter).  Walter told him not to worry about it and that they would figure it out the following day.  They agreed to meet at Walter's house.  Soon thereafter, agents surveilling Walter saw him park his car in front of 25 Royal Road, go inside, and come out after a few minutes.  The Court infers that Walter went to 25 Royal Road to pick up the marijuana that he had agreed to provide to MacAuley. Walter put an item in his trunk and then drove into the garage at his apartment building, 30 Gardner Road.  MacAuley later pulled up outside, went in, and came out less than twenty minutes later carrying a yellow plastic bag.

On September 23, 2003, Kurt Walter called Dan MacAuley. Walter and MacAuley discussed the last time they met in order to give Kurt Walter marijuana proceeds.  Walter asked MacAuley, "When was the last day you met me?"  "Was the last time you met me, right, to give me something, right, what was it?"  MacAuley could not remember, but replied, making reference to delivering marijuana proceeds to Walter, "It was a large one," and that it was at Walter's mother's house in the kitchen (25 Royal Road). Kurt Walter recalled that the day was "8/30." Kurt Walter also stated, "that was a big one at my mom's" and that he did not see MacAuley again until "9/17." Kurt Walter stated that he "has all those figures down."  They agreed to meet at 1:30 at the Dunkin'

5

Donuts near Wollaston Boulevard.

In late October 2003, Walter and MacAuley met to do a deal before MacAuley then went on to sell some marijuana to one of his customers.  In two calls on October 20, 2003, Walter told MacAuley that he had more marijuana for him and they agreed to meet the following day.  A call on October 21, 2003 at approximately 3:45 pm indicated that MacAuley was traveling to meet Walter.  Surveillance agents saw Walter go to 25 Royal Road and enter the garage there; then, after a short time, Walter drove to the 30 Gardner Road residence and went into the garage.  From this, one can infer that once again, Walter went to the Defendant Property to pick up the marijuana that he had committed to provide to MacAuley.  Surveillance officers observed MacAuley arrive in the area and enter 30 Gardner Road empty-handed.  About 15 minutes later, MacAuley emerged from the building with a medium to large sized cardboard box over his shoulder, got into his car, and left the area.  MacAuley was followed to a Dunkin Donuts in Quincy where he met with his own customer, Paul.  Paul entered MacAuley's vehicle empty-handed, but later exited the vehicle with a large object (covered by a jacket) under his arm.

On September 3, 2003, Kurt Walter called Francis Duggan, one of his marijuana distributors.  During the conversation Kurt Walter indicated that he had to travel to a different location

than his mother's house (25 Royal Road) to get marijuana for Duggan.  Specifically, Kurt Walter told Duggan he had to "take a ride" because his "mom's house (25 Royal Road) is gone now.  You know what I mean?"  Duggan indicated that he understood.  Kurt Walter further stated that he didn't have access to the house "the way I used to."  Walter meant that he could no longer store large quantities of marijuana at the Defendant Property, even though he was still storing small quantities of marijuana there.

Duggan asked Walter to do the best he could, but then said that he was "dying over here."  "I've got nothing to smoke, nothing to sell.  I'm in agony."  Kurt Walter told Duggan to "Watch the phone."  Based on information DEA learned through out its investigation, Kurt Walter and Duggan were discussing obtaining marijuana for Duggan.  Kurt Walter's statement that his "mom's house is gone now," and that he didn't "have the way I used to," refers to how Kurt Walter was unable to use 25 Royal Road as a stash location for large quantities of marijuana any longer because it was on the market for sale.

On September 29, 2003, during a controlled marijuana transaction with a cooperating individual, Kurt Walter stated that he used to keep it (marijuana) at his mother's house (25 Royal Road) but he was no longer able to use the property because the house was on the market.  At the time Kurt Walter made these

remarks, 25 Royal Road was, in fact, on the market.

Kim Frank ("Frank") was a customer of Kurt Walter from 1997 through 2003, after the death of Doris Walter. Frank paid Walter about $1,300 per pound of marijuana. Frank was, at the time, a long-time friend of Melissa Walter, and an assistant to Doris Walter while she was dying.

Frank bought marijuana from Walter in a number of locations. Frank's practice was to meet Walter at his apartment as well as at 25 Royal Road (the Defendant Property). In a typical transaction, Frank called Walter to make arrangements with him regarding the marijuana in advance. Then, when she went to visit Doris Walter at the Defendant Property, she would say "let's just do this."

On two or three occasions, Frank and Walter walked out into the backyard of 25 Royal Road (the Defendant Property), and Walter sold her marijuana in the backyard. On two other occasions, Frank bought marijuana from Walter in the kitchen of the Defendant Property. These transactions occurred while Doris Walter was alive. There may have also been occasions when Frank bought marijuana from Walter at 25 Royal Road (the Defendant Property) after Doris Walter died. These transactions were for a pound of marijuana each time. Frank had discussions with Melissa Walter about the fact that Kurt Walter was selling marijuana.

Melissa Walter also told Kim Frank about finding a scale with marijuana on it at 25 Royal Road (the Defendant Property).

On September 20, 2003, Melissa Walter left a voicemail message on Kurt Walter's phone, stating that she was "at Mum's," that is, 25 Royal Road.  Melissa Walter informed her brother, "Listen, we were going through the basement and we found all these little moist buds of pot.  So Kurt, you cannot have pot up here anymore.  You know because the realtor is gonna be coming through here a lot."  She concluded the call by saying "no more dope and no parties and no hanging out up he[re] anymore."  In a telephone conversation the following day, September 21, 2003, Melissa Walter reminded her brother that potential buyers would be visiting 25 Royal Road and told him to remove the evidence of narcotics trafficking.

> MELISSA: I'm, you need to get that digital scale out of Mum's house okay.
>
> KURT: Yeah
>
> MELISSA: And you can't be doing that in the house.
>
> KURT: Melissa that thing has been there for a while.
>
> MELISSA: Well Kurt it was covered with weed. So I don't know how long a while is in your book, okay?
>
> KURT: Yeah

```
MELISSA:   And we wiped it off so.

KURT:      Okay

MELISSA:   You gotta get that out of there and
           there was just tons of buds all over
           the floor

KURT:      Okay.
```

After this telephone call, Melissa Walter brushed the marijuana off the scale and returned it to its original box. She left it for Kurt Walter to pick up. Kurt Walter did not pick up the scale, and it was located by DEA in a search of the Defendant property pursuant to warrant on December 2, 2003. The scale was a digital scale with a 40 pound capacity, and marijuana residue was visible on the scale and on the packaging. DEA also found a duffel bag in the basement of 25 Royal Road containing a ziplock bag of 113.2 grams of marijuana.

Walter acknowledges that he had more than one scale, including an electronic scale, and that the purpose of having a scale was to weigh out marijuana for distribution. He admits that one of his scales was electronic.

Walter has serious memory lapses. He cannot recall:

(a)  whether there were any days between 2000 and 2003 when he did not smoke marijuana

   (b)  The names of any of his customers for marijuana

(c)  how many customers he had, although it was "a fairly good amount"

(d)  how much he sold marijuana to Dan MacAuley for

(e)  when he started buying marijuana from co-defendant Douglas Bannerman

(f)  what his own cell phone number was when he dealt with Bannerman

(g)  whether he used the word paperwork to refer to marijuana proceeds

(h)  whether he used "schedule" or "hours" as code to refer to marijuana

(i)  where Bannerman's office was

(j)  whether he negotiated with Bannerman about price

(k)  whether Bannerman ever sold him cocaine

(l)  whether he himself ever sold cocaine

(m)  when he first moved to the apartment at 30 Gardner Road

(n)  when he first rented the storage unit that he claims is the only location he ever stored marijuana in

(o)  the name of the storage company that he used for storing the marijuana from at least 2000 forward

(p)  the name of the storage unit that he used for storing the marijuana from at least 2000 forward

(q)  the name of the street where the storage unit was that he used for storing the marijuana from at least 2000 forward

(r)  how often his former business partner, John McCarthy, bought marijuana from him

(s)  how much marijuana he hid in the storage unit at any given time

(t)  how many scales he had for weighing marijuana

(u)  whether John McCarthy bought marijuana on credit

(v)  whether he got upset with customers for not paying on time

(w)  how much marijuana he smoked at 25 Royal Road at any given time

(x)  whether he was using more cocaine after his mother's death

(y)  what friends he invited to his mother's home after her

       death

- (z) whether other people smoked marijuana at his mother's home after his death
- (aa) whether he smoked marijuana in front of other people at his mother's home after her death
- (bb) whether he left a bag of marijuana at his mother's house
- (cc) whether his sister called about marijuana he left at 25 Royal Road (his mother's house)
- (dd) with reference to the marijuana that his sister may have called him about leaving at their mother's house, whether he got it out or threw it away
- (ee) with reference to the marijuana that his sister may have called him about leaving at their mother's house, how much marijuana it was
- (ff) with reference to the marijuana that his sister may have called him about leaving at their mother's house, whether she called him a second time.

## II. LAW

Title 21, United States Code, Section 881 provides that the following shall be subject to forfeiture to the United States and no property rights shall exist in them:

> All real property, including any right, title, and interest (including any leasehold interest) in the whole of any lot or tract of land and any appurtenances or improvements, which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this sub-chapter punishable by more than one year's imprisonment.

21 U.S.C. § 881(a)(7).

Section 841 makes it a crime to knowingly or intentionally "distribute . . . , or possess with intent to . . . distribute .

. . . a controlled substance." 21 U.S.C. § 841(a)(1). Section 841 sets the maximum penalty for the sale of marijuana from 5 years [§ 841(b)(1)(D)] to life [§ 841(b)(1)(A)(vii)] depending on the quantity sold.

Section 846 of Title 21 makes it a crime to conspire to distribute marijuana, with the same penalties. Further, § 856 makes it a crime to "(1) knowingly open or maintain any place for the purpose of manufacturing, distributing, or using any controlled substance; (2) manage or control [such property], either as an owner, lessee, agent, employee, or mortgagee, and knowingly and intentionally ... make available for use, with or without compensation, the building, room, or enclosure for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance." 21 U.S.C. § 856(a)(1) and (2).

Pursuant to 18 U.S.C. § 983(c), the government has the burden of proving that the property is subject to forfeiture by a preponderance of the evidence. Additionally, because the government alleges that the property was used to commit or to facilitate the commission of a criminal offense, the government must establish that there is a "substantial connection" between the property and the offense. 18 U.S.C. § 983(c)(3).

The "substantial connection" test requires only that the property was used, or intended to be used, to commit a crime, or

13

must facilitate the commission of a crime.  Real property may be forfeited if it had "more than 'an incidental or fortuitous connection'" to criminal activity.  <u>United States v. One Lot of U.S. Currency ($36,634)</u>, 103 F.3d 1048, 1055 (1st Cir. 1997) (quoting <u>United States v. 1933 Commonwealth Avenue, Newton, Massachusetts</u>, 913 F.2d 1, 3 (1st Cir. 1990)).  <u>See</u> <u>also</u> <u>Schifferli</u>, 895 F.2d at 990.  Under First Circuit law, there is a substantial connection between real estate and drug trafficking, for purposes of 21 U.S.C. § 881(a)(7), if drug transactions take place in the real estate.  For example, in <u>United States v. Desmarias</u>, 938 F.2d 347, 353 (1st Cir. 1991), the First Circuit found that there was a substantial connection to a residence sufficient to support its forfeiture where the owner of the residence had accepted the controlled delivery of an express mail package of marijuana at the residence, and a search of the residence revealed the marijuana, 19 grams of hashish, and a triple beam scale.  <u>Id</u>. at 349, 353.  The Court noted that *either* the fact that the package was addressed to the residence or the fact that controlled substances and a scale were found during a search of the residence was sufficient to establish a "substantial connection" between the residence and the commission of the substantive offense.  <u>Id</u>. (emphasis in original).

Here, the evidence establishes a substantial connection

between the Defendant Property and the illegal conduct committed by Kurt Walter.  The undisputed evidence is that Kurt Walter had an electronic scale with marijuana residue at the Defendant Property, and that he used scales to weigh drugs to distribute to marijuana customers.  The undisputed evidence is that Kurt Walter had a quarter pound of marijuana at the Defendant Property at the time of the DEA search.  He distributed in amounts as small as a quarter pound, and he did not distinguish his own "personal use" marijuana from the marijuana he distributed.  Therefore, there is a substantial connection between the Defendant Property and the substantive offenses of conviction, conspiring to distribute and distributing marijuana.

Moreover, in the instant case, there is a substantially greater connection to the Defendant Property, because it is beyond dispute that Walter was using the property as a stash house.  In a consensually recorded meeting on September 29, 2003, surveilled by DEA agents, Walter is taped telling a cooperating witness that he had to move his marijuana stash location from his mother's house since her house was on the market.  Additionally, DEA agents listening to Walter on telephone intercepts on two occasions heard him set up a marijuana deal, set a time to meet a customer, and then stop by the Defendant Property in advance of meeting the customer.

There is also significant evidence that Walter actually distributed out of the Defendant Property. By his own admission, he met with his customers "all over." He met with them at bookstores, restaurants, Home Depot, parking lots – "there was no set specific place." Customer Kim Frank testified that she had purchased marijuana in one pound quantities from Kurt Walter at least two times in the kitchen at the Defendant Property, and at least one other time at the outside of the house. From this evidence, the connection between Walter's crimes and the Defendant Property is simply overwhelming.

Defendant argues that forfeiture of the Defendant Property would constitute an excessive fine. However, a fine will violate the excessive fines clause of the eighth amendment only if it is "grossly disproportional to the gravity of the offense." United States v. Bajakajian, 524 U.S. 321, 328 (1998); see also United States v. Heldeman, 402 F.3d 220, 223 (1st Cir. 2005).

In rendering this analysis, the Court must look to whether the defendant falls in the category of persons against whom the criminal statute was principally directed; other penalties authorized by the legislature, and the harm caused by the defendant. Here, the defendant is a drug trafficker who had made the greater part of his income over the past 20 years off of drug dealing. He is clearly someone against whom the statute is

directed. With regard to the remaining factors, one factor of "special significance" in this analysis is whether the forfeiture is less than the statutory maximum fine or the Guideline fine. <u>Heldeman</u>, 402 F.3d at 223. In the instant case, the statutory maximum fine equals the Guideline maximum fine. <u>See</u> USSG § 5E1.2(c)(4).

Kurt Walter was subject to a potential fine of $5,750,000 pursuant to 21 U.S.C. § 841(b)(1) and 18 U.S.C. § 3571(b) for the crimes to which he pled guilty. This potential fine is approximately 16 times the value of the amount of his claim. Accordingly, the Court should find that the amount of the forfeiture does not constitute an excessive fine.

                              Respectfully submitted,

                              MICHAEL J. SULLIVAN
                              United States Attorney

                    By:  <u>/s/ Nancy Rue</u>
                        NANCY RUE
                        KRISTINA E. BARCLAY
                        Assistant U.S. Attorneys
                        United States Courthouse
                        One Courthouse Way
                        Suite 9200
                        Boston, Massachusetts 02210
Dated: August 6, 2007      (617)748-3100