UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
UNITED STATES OF AMERICA,         )
                Plaintiff,        )
                                  )
      v.                          ) Civil Action No. 04-10191-DPW
                                  )
25 ROYAL ROAD, BROOKLINE,         )
MASSACHUSETTS,                    )
                Defendant.        )
_____   )
KURT WALTER,                      )
                Claimant.         )
```

**UNITED STATES' PROPOSED**
**FINDINGS OF FACT AND CONCLUSION OF LAW**

The plaintiff, United States of America, respectfully submits this Proposed Findings of Fact and Conclusion of Law pursuant to the Court's Order Regulating Non-Jury Trial.

**I.    PROPOSED FINDINGS OF FACT**

1.    The defendant in the above-captioned case is the real property located at 25 Royal Road, Brookline, Massachusetts (the "Defendant Property").

2.    The Defendant Property was owned by Doris M. Walter until her death on May 16, 2003.  Under Doris Walter's will, the Defendant Property passed in equal parts to her children, Melissa and Kurt Walter.

3.    Kurt Walter ("Walter") distributed marijuana consistently over the past twenty years.  Walter used the defendant property to distribute and store marijuana.

4.   From the year 2000 forward, Walter derived most of his income from the distribution of marijuana.

5.   Walter "constantly had a supply of marijuana." He met with his customers "all over." He met with them at bookstores, restaurants, Home Depot, parking lots – "there was no set specific place."

6.   Walter made about $30,000 per year from marijuana sales from 2000 through his arrest at the end of 2003.

7.   Between 2000 and his arrest at the end of 2003, Walter also smoked marijuana every day. Walter did not distinguish between the marijuana for his own use and that which was for distribution.

8.   Dan MacAuley ("MacAuley") was a marijuana customer of Walter's from 2000 through 2003.

9.   MacAuley bought varying amounts of marijuana from Walter. MacAuley sometimes bought as little as a quarter pound (113.5 grams) from Walter. Other times, he bought as much as five pounds at a time.

10.  A wiretap authorized by a federal court on Walter's telephone produced tape recordings of telephone calls between Walter and MacAuley regarding marijuana sales.

11.  On August 19, 2003, there was a series of intercepted calls and voice mail messages between Walter and MacAuley

indicating that they planned to meet that night.  In one of these calls, MacAuley explained to Walter that he needed to see Walter that night, but that he didn't have the "paperwork" (money for marijuana).  In another of these calls, Walter told MacAuley, "if you've got a bag, bring it.  You got a duffel (bag), bring it." They agreed to meet the following morning.

12.  On the following morning, August 20, 2003, a surveillance agent saw MacAuley and Walter together near the Chinese restaurant in Newton Center that Walter was working to renovate.  Walter took a black bag out of the truck that MacAuley had arrived in and brought the bag toward the restaurant.  Walter then took a cardboard box out of his BMW and gave it to MacAuley. MacAuley then drove away.

13.  The nature of this transaction, Walter providing MacAuley with marijuana on consignment, was confirmed by a call later in the day, when MacAuley reminded Walter about a loan that MacAuley had made to him in the past.  Walter assured MacAuley that neither of them would cheat the other, and that there was no need to worry.  This was a reference to MacAuley's drug debt to Walter, based on the marijuana that Walter had given him.  The parties then discussed a future transaction.  MacAuley asked Walter if Walter would have "more" for MacAuley as soon as "he" (a customer) called MacAuley.  Walter agreed to give MacAuley

"more in a couple of days, but call me as soon as he call(s) you back."

14.   A few days later, MacAuley and Walter again spoke by telephone.  In a call on August 24, 2003, MacAuley reported to Walter that he "had loads of paperwork and [he was] ready to go" (meaning that he had money and was ready to get more marijuana from Walter).  Walter, apparently surprised by the speed with which MacAuley had sold the prior marijuana load, asked "again?" MacAuley responded "it's bad out . . . it's bad out there" (i.e., it was difficult to get marijuana).  Walter told MacAuley that he had "only probably ten or fifteen for ya" (meaning that he only had a certain quantity of marijuana available for MacAuley), to hold him over for another week or two.  MacAuley corrected Walter and told him that this amount would only hold him for a week or so.

15.   Intercepted telephone calls between MacAuley and Walter show that MacAuley bought marijuana from Walter at the Defendant Property.  In a series of intercepted calls during the period September 12 to 15, 2003, Walter and MacAuley made arrangements to meet.  On September 15, 2003, Walter told him he could meet him that day, but people were showing the house (25 Royal Road, his late mother's home, which was on the market) so he wouldn't be able to get in there until later.  MacAuley replied that he

4

"didn't come prepared" (he did not have the drug proceeds to pay Walter).  Walter told him not to worry about it and that they would figure it out the following day.

16.  They agreed to meet at Walter's house.  Soon thereafter, agents surveilling Walter saw him park his car in front of 25 Royal Road, go inside, and come out after a few minutes.  The Court infers that Walter went to 25 Royal Road to pick up the marijuana that he had agreed to provide to MacAuley. Walter put an item in his trunk and then drove into the garage at his apartment building, 30 Gardner Road.  MacAuley later pulled up outside, went in, and came out less than twenty minutes later carrying a yellow plastic bag.

17.  On September 23, 2003, Kurt Walter called Dan MacAuley. Walter and MacAuley discussed the last time they met in order to give Kurt Walter marijuana proceeds.  Walter asked MacAuley, "When was the last day you met me?"  "Was the last time you met me, right, to give me something, right, what was it?"  MacAuley could not remember, but replied, making reference to delivering marijuana proceeds to Walter, "It was a large one," and that it was at Walter's mother's house in the kitchen (25 Royal Road). Kurt Walter recalled that the day was "8/30."  Kurt Walter also stated, "that was a big one at my mom's" and that he did not see MacAuley again until "9/17."  Kurt Walter stated that he "has all

5

those figures down." They agreed to meet at 1:30 at the Dunkin' Donuts near Wollaston Boulevard.

18.  In late October 2003, Walter and MacAuley met to do a deal before MacAuley then went on to sell some marijuana to one of his customers.  In two calls on October 20, 2003, Walter told MacAuley that he had more marijuana for him and they agreed to meet the following day.  A call on October 21, 2003 at approximately 3:45 pm indicated that MacAuley was traveling to meet Walter.  Surveillance agents saw Walter go to 25 Royal Road and enter the garage there; then, after a short time, Walter drove to the 30 Gardner Road residence and went into the garage. The Court infers that once again, Walter went to the Defendant Property to pick up the marijuana that he had committed to provide to MacAuley.  Surveillance officers observed MacAuley arrive in the area and enter 30 Gardner Road empty-handed.  About 15 minutes later, MacAuley emerged from the building with a medium to large sized cardboard box over his shoulder, got into his car, and left the area.  MacAuley was followed to a Dunkin Donuts in Quincy where he met with his own customer, Paul.  Paul entered MacAuley's vehicle empty-handed, but later exited the vehicle with a large object (covered by a jacket) under his arm.

19.  On September 3, 2003, Kurt Walter called Francis Duggan, one of his marijuana distributors.  During the

conversation Kurt Walter indicated that he had to travel to a
different location than his mother's house (25 Royal Road) to get
marijuana for Duggan.  Specifically, Kurt Walter told Duggan he
had to "take a ride" because his "mom's house (25 Royal Road) is
gone now.  You know what I mean?"  Duggan indicated that he
understood.  Kurt Walter further stated that he didn't have
access to the house "the way I used to."  Walter meant that he
could no longer store large quantities of marijuana at the
Defendant Property, even though he was still storing small
quantities of marijuana there.

20.  Duggan asked Walter to do the best he could, but then
said that he was "dying over here."  "I've got nothing to smoke,
nothing to sell.  I'm in agony."  Kurt Walter told Duggan to
"Watch the phone."  Based on information DEA learned through out
its investigation, Kurt Walter and Duggan were discussing
obtaining marijuana for Duggan.  Kurt Walter's statement that his
"mom's house is gone now," and that he didn't "have the way I
used to," refers to how Kurt Walter was unable to use 25 Royal
Road as a stash location for large quantities of marijuana any
longer because it was on the market for sale.

21.  On September 29, 2003, during a controlled marijuana
transaction with a cooperating individual, Kurt Walter stated
that he used to keep it (marijuana) at his mother's house (25

7

Royal Road) but he was no longer able to use the property because the house was on the market.  At the time Kurt Walter made these remarks, 25 Royal Road was, in fact, on the market.

22.  Kim Frank ("Frank") was a customer of Kurt Walter from 1997 through 2003, after the death of Doris Walter.

23.  Frank paid Walter about $1,300 per pound of marijuana. Frank was, at the time, a long-time friend of Melissa Walter, and an assistant to Doris Walter while she was dying.

24.  Frank bought marijuana from Walter in a number of locations.  Frank's practice was to meet Walter at his apartment as well as at 25 Royal Road (the Defendant Property).  In a typical transaction, Frank called Walter to make arrangements with him regarding the marijuana in advance.  Then, when she went to visit Doris Walter at the Defendant Property, she would say "let's just do this."

25.  On two or three occasions, Frank and Walter walked out into the backyard of 25 Royal Road (the Defendant Property), and Walter sold her marijuana in the backyard.  On two other occasions, Frank bought marijuana from Walter in the kitchen of the Defendant Property.

26.  These transactions occurred while Doris Walter was alive.  There may have also been occasions when Frank bought marijuana from Walter at 25 Royal Road (the Defendant Property)

8

after Doris Walter died.  These transactions were for a pound of marijuana each time.  Frank had discussions with Melissa Walter about the fact that Kurt Walter was selling marijuana.  Melissa Walter also told Kim Frank about finding a scale with marijuana on it at 25 Royal Road (the Defendant Property).

27.  On September 20, 2003, Melissa Walter left a voicemail message on Kurt Walter's phone, stating that she was "at Mum's," that is, 25 Royal Road.  Melissa Walter informed her brother, "Listen, we were going through the basement and we found all these little moist buds of pot.  So Kurt, you cannot have pot up here anymore.  You know because the realtor is gonna be coming through here a lot."  She concluded the call by saying "no more dope and no parties and no hanging out up he[re] anymore."

28.  In a telephone conversation the following day, September 21, 2003, Melissa Walter reminded her brother that potential buyers would be visiting 25 Royal Road and told him to remove the evidence of narcotics trafficking.

> MELISSA:  I'm, you need to get that digital
>           scale out of Mum's house okay.
>
> KURT:     Yeah
>
> MELISSA:  And you can't be doing that in the
>           house.
>
> KURT:     Melissa that thing has been there
>           for a while.

9

> MELISSA:  Well Kurt it was covered with weed.
> So I don't know how long a while is
> in your book, okay?
>
> KURT:     Yeah
>
> MELISSA:  And we wiped it off so.
>
> KURT:     Okay
>
> MELISSA:  You gotta get that out of there and
> there was just tons of buds all over
> the floor
>
> KURT:     Okay.

29.  After this telephone call, Melissa Walter brushed the marijuana off the scale and returned it to its original box.  She left it for Kurt Walter to pick up.

30.  Kurt Walter did not pick up the scale, and it was located by DEA in a search of the Defendant property pursuant to warrant on December 2, 2003.  The scale was a digital scale with a 40 pound capacity, and marijuana residue was visible on the scale and on the packaging.  DEA also found a duffel bag in the basement of 25 Royal Road containing a ziplock bag of 113.2 grams of marijuana.

31.  Walter acknowledges that he had more than one scale, including an electronic scale, and that the purpose of having a scale was to weigh out marijuana for distribution.  He admits that one of his scales was electronic.

32.  Walter has serious memory lapses.  He cannot recall:

(a)  whether there were any days between 2000 and 2003 when he did not smoke marijuana

(b)  The names of any of his customers for marijuana

(c)  how many customers he had, although it was "a fairly good amount"

(d)  how much he sold marijuana to Dan MacAuley for

(e)  when he started buying marijuana from co-defendant Douglas Bannerman

(f)  what his own cell phone number was when he dealt with Bannerman

(g)  whether he used the word paperwork to refer to marijuana proceeds

(h)  whether he used "schedule" or "hours" as code to refer to marijuana

(i)  where Bannerman's office was

(j)  whether he negotiated with Bannerman about price

(k)  whether Bannerman ever sold him cocaine

(l)  whether he himself ever sold cocaine

(m)  when he first moved to the apartment at 30 Gardner Road

(n)  when he first rented the storage unit that he claims is the only location he ever stored marijuana in

(o)  the name of the storage company that he used for storing the marijuana from at least 2000 forward

(p)  the name of the storage unit that he used for storing the marijuana from at least 2000 forward

(q)  the name of the street where the storage unit was that he used for storing the marijuana from at least 2000 forward

(r)  how often his former business partner, John McCarthy, bought marijuana from him

(s)  how much marijuana he hid in the storage unit at any given time

(t)  how many scales he had for weighing marijuana

(u)  whether John McCarthy bought marijuana on credit

(v)  whether he got upset with customers for not paying on

time

(w)  how much marijuana he smoked at 25 Royal Road at any
given time

(x)  whether he was using more cocaine after his mother's
death

(y)  what friends he invited to his mother's home after her
death

(z)  whether other people smoked marijuana at his mother's
home after his death

(aa) whether he smoked marijuana in front of other people at
his mother's home after her death

(bb) whether he left a bag of marijuana at his mother's
house

(cc) whether his sister called about marijuana he left at 25
Royal Road (his mother's house)

(dd) with reference to the marijuana that his sister may
have called him about leaving at their mother's house,
whether he got it out or threw it away

(ee) with reference to the marijuana that his sister may
have called him about leaving at their mother's house,
how much marijuana it was

(ff) with reference to the marijuana that his sister may
have called him about leaving at their mother's house,
whether she called him a second time

33.  From the above events, the Court finds that Kurt Walter

stored marijuana at the Defendant Property; that he stored an

electronic scale at the Defendant Property for purposes of

marijuana distribution, and that he sold marijauna from the

Defendant Property.

12

## II.  **PROPOSED CONCLUSIONS OF LAW**

1.    Title 21, United States Code, Section 881 provides that the following shall be subject to forfeiture to the United States and no property rights shall exist in them:

> All real property, including any right, title, and interest (including any leasehold interest) in the whole of any lot or tract of land and any appurtenances or improvements, which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this sub-chapter punishable by more than one year's imprisonment.

21 U.S.C. § 881(a)(7).

2.    Section 841 makes it a crime to knowingly or intentionally "distribute . . . , or possess with intent to . . . distribute . . . a controlled substance." 21 U.S.C. § 841(a)(1). Section 841 sets the maximum penalty for the sale of marijuana from 5 years [§ 841(b)(1)(D)] to life [§ 841(b)(1)(A)(vii)] depending on the quantity sold.

3.    Section 846 of Title 21 makes it a crime to conspire to distribute marijuana, with the same penalties.

4.    Further, § 856 makes it a crime to "(1) knowingly open or maintain any place for the purpose of manufacturing, distributing, or using any controlled substance; (2) manage or control [such property], either as an owner, lessee, agent, employee, or mortgagee, and knowingly and intentionally ... make available for use, with or without compensation, the building,

room, or enclosure for the purpose of unlawfully manufacturing,
storing, distributing, or using a controlled substance."  21
U.S.C. § 856(a)(1) and (2).

5.    The United States has shown by a preponderance of the
evidence that Walter used the Defendant Property to distribute
marijuana for sale, and that he stored marijuana for sale on the
Defendant Property.

6.    The government has therefore shown a substantial
connection to the crime alleged.  Kurt Walter had an electronic
scale with marijuana residue at the Defendant Property and that
he used scales to weigh drugs to distribute to marijuana
customers.  Kurt Walter had a quarter pound of marijuana at the
Defendant Property at the time of the DEA search.  He distributed
in amounts as small as a quarter pound, and he did not
distinguish his own "personal use" marijuana from the marijuana
he distributed.

7.    The Court credits the testimony of Kim Frank that she
purchased marijuana from Walter at the Defendant Property.

8.    The Court also concludes that Walter stored marijuana
at the Defendant Property, based both on the observations of law
enforcement agents that Walter picked up bundles from the

14

property immediately before drug transactions with MacAuley and
based on Walter's intercepted statements to marijuana customers.

9.    Therefore, the Court finds that there is a substantial
connection between the Defendant Property and the substantive
offenses alleged for forfeiture, conspiring to distribute and
distributing marijuana.

10.    The Court concludes that forfeiture of the Defendant
Property does not constitute an excessive fine.  A fine will
violate the excessive fines clause of the eighth amendment only
if it is "grossly disproportional to the gravity of the offense."
United States v. Bajakajian, 524 U.S. 321, 328 (1998); see also
United States v. Heldeman, 402 F.3d 220, 223 (1st Cir. 2005).

11.    In rendering this analysis, the Court must look to
whether the defendant falls in the category of persons against
whom the criminal statute was principally directed; other
penalties authorized by the legislature, and the harm caused by
the defendant.  Here, the defendant is a drug trafficker who had
made the greater part of his income over the past 20 years off of
drug dealing.  He is clearly someone against whom the statute is
directed.  With regard to the remaining factors, one factor of
"special significance" in this analysis is whether the forfeiture

15

is less than the statutory maximum fine or the Guideline fine.

Heldeman, 402 F.3d at 223.  In the instant case, the statutory

maximum fine equals the Guideline maximum fine.  See USSG

§ 5E1.2(c)(4).

12.  Kurt Walter was subject to a potential fine of

$5,750,000 pursuant to 21 U.S.C. § 841(b)(1) and 18 U.S.C.

§ 3571(b) for the crimes to which he pled guilty.  This potential

fine is approximately 16 times the value of the amount of his

claim.  Accordingly, the Court finds that the amount of the

forfeiture does not constitute an excessive fine.

                                   Respectfully submitted,

                                   MICHAEL J. SULLIVAN
                                   United States Attorney


                              By:  /s/ Nancy Rue
                                   NANCY RUE
                                   KRISTINA E. BARCLAY
                                   Assistant U.S. Attorneys
                                   United States Courthouse
                                   One Courthouse Way
                                   Suite 9200
                                   Boston, Massachusetts 02210
Dated: February 5, 2007            (617)748-3100