```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,     )
             Plaintiff,       )
                              )
     v.                       ) Civil Action No. 04-10191-DPW
                              )
25 ROYAL ROAD, BROOKLINE,     )
MASSACHUSETTS,                )
             Defendant.       )
_____)
KURT Walter,                  )
             Claimant.        )
```

### AFFIDAVIT OF SPECIAL AGENT BRIAN TOMASETTA

I, **Brian Tomasetta**, being duly sworn, depose and state:

1. I am a Special Agent with the U.S. Drug Enforcement Administration ("DEA") and have been so employed for the past 18 years. I am currently assigned to DEA's Boston, Massachusetts Field Division Office. Prior to my career with DEA, I served as a Vermont State Trooper for two years. During my tenure as a Special Agent, I have participated in over 200 arrests involving narcotics violations. I have participated in the execution of numerous search warrants resulting in seizures of large quantities of controlled substances, packing implements and other paraphernalia involved in the manufacture and distribution of controlled substances. This paraphernalia includes ledger books, bank records, receipts, drug customer lists, and other documents relating to the manufacture, transportation, ordering, purchasing and distribution of controlled substances.

2. During my law enforcement career, I have received

specialized training regarding the activities of narcotics traffickers, including the methods used to package, store, and distribute narcotics, and the methods used by narcotics traffickers to conceal and launder the proceeds of their narcotics trafficking activities. In addition to my training, I have had extensive experience in the investigation of the activities of narcotics traffickers.  Since joining the DEA, I have participated in numerous narcotics investigations as a case agent and in a supporting role.  I have debriefed numerous defendants, informants, and witnesses who had personal knowledge about narcotics trafficking activities and the operation of narcotics trafficking organizations.

    3.   I personally have participated in all aspects of narcotics trafficking investigations, including conducting surveillance, using confidential informants, acting in an undercover capacity, and conducting court-authorized interceptions of wire and electronic communications.  During my law enforcement career, I have also participated in the preparation and/or execution of numerous search warrants.

    4.   Based upon my training and experience, I am familiar with narcotics traffickers' methods of operation, including the distribution, storage, and transportation of narcotics and the collection of money that constitutes the proceeds of narcotics trafficking activities.  Specifically, I am familiar with the manner in which narcotics traffickers use vehicles, common

carriers, mail and private delivery services, and a variety of other means to transport and distribute narcotics and the proceeds of narcotics trafficking.  I also am familiar with the manner in which narcotics traffickers use telephones, coded or cryptic language or slang in telephone conversations and voicemail messages, and other means to facilitate their illegal activities.  I have been the co-case agent (along with DEA Special Agent Dennis Barton) in the investigation described in detail below.

    5.   During my work on this investigation, I have interviewed witnesses and cooperating individuals about their knowledge of the matters described below.  In addition, I and other agents working on this investigation have thoroughly debriefed confidential informants and cooperating witnesses concerning their knowledge of the narcotics-trafficking activities discussed below.  I have also reviewed reports prepared by agents regarding other witness interviews, and discussed this case with agents and local law enforcement officers who have been involved in this investigation.

### Investigation

    6.   As a result of my personal participation in this investigation, through my conversations with other agents and officers, and my analysis of reports prepared by other agents, I am familiar with all aspects of this investigation.

7.   Kurt Walter ("Walter") was identified as a target of an investigation that began in 2001 into marijuana trafficking and money laundering. DEA's investigation showed that, during 2003, Kurt Walter received large quantities of marijuana from Douglas Bannerman.  Kurt Walter then distributed the marijuana to others for resale, including, but not limited to Daniel Macauley, John McCarthy, Francis Duggan, Kim Frank, and Michelle Coppola.

8.   During the course of this investigation, I sought and received orders allowing interceptions of telephone communications under Title III, beginning with an Order issued July 21, 2003, issued by United States District Judge Joseph L. Tauro authorizing the interception of wire communications over (617) 901-0104, an AT&T wireless telephone subscribed to by Kurt Walter, 25 Royal Road, Brookline, MA ("Target Telephone 1").  On August 19, 2003, the Court issued a renewal order for an additional thirty days.  On August 15, 2003, United States District Judge Patti B. Saris issued an order authorizing the interception of wire communications over a hard line at Walter's residence, (617) 227-4117, at 30 Gardner Road, Apartment 2c in Brookline, MA ("Target Telephone 2").  She also authorized the interception of a telephone used by Walter's source of supply for marijuana, Douglas Bannerman, subscribed to in the name of Karen Woo, at 60 Lawton Street, Brookline ("Target Telephone 3"). Interception on these telephones began on August 15, 2003.  An

order authorizing the continued interception on all three of these telephones was signed on September 12, 2003. On October 10, 2003, Judge Saris entered an order authorizing the interception of communications over a fourth telephone, (617) 721-1998, a Verizon wireless prepaid telephone used by Douglas Bannerman but subscribed in the name Sarah Smith ("Target Telephone 4"). At the same time, Judge Saris authorized the renewal of interceptions over the other three telephones.

### TELEPHONE CALLS INVOLVING KURT Walter

9. The telephone communications intercepted pursuant to the above court authorization involving Walter took place in English, and therefore I was able to personally listen to the calls. As case agent on the investigation, I listened to literally hundreds of calls by Walter regarding his marijuana trafficking. I also reviewed transcripts of calls prepared by other law enforcement officers and spoke with other agents and local law enforcement officers who monitored Walter's calls.

10. Through the monitoring of hundreds of calls involving Walter, I learned that Walter was very careful to avoid explicit references to marijuana, weight quantities, or cash quantities, over the telephone. On at least two occasions, when an associate would carelessly refer to terms that could be easily construed as drug-related, such as "smoke," Walter admonished the caller not to talk like that on the telephone.

5

11.  Through monitoring these calls while surveilling Walter's actions, I also noted a pattern regarding Walter's transactions. When Walter agreed to meet a customer to provide marijuana, he frequently stopped at his mother's residence at 25 Royal Road prior to meeting the customer.  Likewise, when Walter agreed to meet his supplier, Douglas Bannerman, to obtain a supply of marijuana, Walter first went to 25 Royal Road.

12.  I know from my experience investigating narcotics crimes, as well as my de-briefing of hundreds of narcotics traffickers, that narcotics dealers usually stash their product at a secure location near their residence, so that they can keep their product secure and yet not keep large quantities of drugs in their own residence.  This is particularly true of marijuana, which is both bulky and strong-smelling.  Stash locations provide a level of security for drug traffickers, to avoid being robbed or detected during the course of the normal interactions in a person's residence.  Stash locations also offer a level of privacy to the drug trafficker when breaking down and re-packaging drugs.

13.  Based on Walter's pattern of saying over the telephone that he had to stop by "mom's" before meeting with a marijuana customer, his observed pattern of actually stopping by 25 Royal Road for less than ten minutes (long enough to pick up an item from the garage or basement), and the observed pattern of his

customers in going to 25 Royal Road when Walter made arrangements to meet them, I conclude that Walter stored marijuana at and distributed marijuana from 25 Royal Road during at least the period from July 26, 2003 through September 2003.

**TELEPHONE CALLS RELATED TO SURVEILLANCE AND 25 ROYAL ROAD**

14.   As case agent, I am familiar with the method undertaken to intercept, record, and store the wire communications in this case.  The intercepted calls are contemporaneously stored and saved in electronic format by the telephone number and the date and time.  The calls referred to herein were stored electronically pursuant to the court order, and the copies submitted in this case are true and accurate copies of the original recordings which are stored in the DEA evidence vault.

15.   I am familiar with the transcripts to these calls.  In the case of each call that I describe below, I have listened to the recordings, and the transcript fairly depicts the communication.

**The July 26, 2003 Transaction.**

16.   On July 23, 2003, at approximately 5:05 p.m., Bannerman called Walter on Target Telephone 1. [Call 155]. During this call, Walter told Bannerman that he was fishing on Saturday.  Walter explained that they would leave from the dock around 8 or 8:30 and will fish until 2 or 3 p.m.  Bannerman said that he'd be back Friday night and Saturday, but was leaving on

Sunday.  The two then had some discussion about what time to meet on Saturday.  They agreed that they would meet on Saturday after Walter's return from the fishing trip.

17.  Calls between Walter and Bannerman on July 26, 2003 show that they were finalizing their plans on when and where to meet that day.  In Call 312 at 4:26 p.m., Walter (who had returned from his fishing trip earlier in the afternoon) explained that he needed about 15 minutes to put things in order.  The call terminated while Walter was speaking.  At 4:28 p.m., (Call 313), Walter called Bannerman back and explained that he needed 15 minutes so he was figuring that their meeting would be in half hour or forty-five minutes.

At approximately 4:55 p.m., surveillance units observed Walter leave the garage at 30 Gardner Road.  Subsequently, they saw Walter's and Bannerman's car at 25 Royal Road.

Based upon the intercepted calls between Walter and Bannerman and the surveillance on July 26, 2003 and the information developed to date in this investigation, I concluded that Walter was arranging to deliver proceeds to Bannerman for past quantities of marijuana; that Bannerman needed to receive this money before Sunday; and that the delivery was made by Walter to Bannerman on the afternoon of July 26th.

### **August 16, 2003 Telephone Call With McCarthy**

18.  On August 16, 2003, at 10:20 a.m., Walter made a

telephone call from his landline, Target Telephone 2, to a telephone subscribed to by John McCarthy [call 6]. McCarthy was one of Walter's marijuana customers. During the course of the telephone call, Walter told McCarthy: "Alright we are ahhh . . . Melissa and Kim are over there," to which McCarthy responded, "Ouch." Based on my experience in this investigation, I understood Walter's statement to mean that Walter's sister, Melissa Walter, and her close friend, Kim Frank, were over at 25 Royal Road, and that because of that, Walter could not go to 25 Royal Road to obtain marijuana for McCarthy. McCarthy further stated during the call: "It's not like you're not going to see me, because eventually you gotta do that thing." I understood this to mean that McCarthy would have to see Walter to deliver drug proceeds and/or receive marijuana from Walter. At the end of the call, Walter said "I'll get those done. She's just . . . ya know what I mean? I gotta be very careful." I believe that Walter was referring to retrieving marijuana from the 25 Royal Road residence for McCarthy without the awareness of Melissa Walter, who was spending time at the residence. McCarthy indicated in the call that he understood, stating: "I mean I'd say it's worth it for me to come back," which I understood to be a reference to coming back from a trip he planned to take. Walter stated in response: "You gotta do something" which I understood to mean that McCarthy had to provide the money for the

9

marijuana. McCarthy concluded, saying: "the sooner they're done" and Walter interjected: "soon as they're done I'll call you." I understood this meant that as soon as Kim Frank and Melissa Walter were out of the 25 Royal Road residence, Walter would retrieve marijuana for McCarthy.

19. A few minutes later, at 10:26 a.m., McCarthy called Walter and asked if he needed any "paperwork" before McCarthy left. Walter said yes. McCarthy said he would be by in ten minutes. I understood this call to mean that McCarthy would deliver money to Walter to pay for the marijuana. In my experience in this case, both listening to telephone calls and debriefing cooperating witnesses, including Kim Frank and Michelle Coppola, "paperwork" was a code used to refer to drug proceeds and payments.

### August 17th and 18th Calls with John McCarthy

20. On August 17, 2003, Walter left a voicemail from his landline, Target Telephone 2, to John McCarthy, telling McCarthy that they "should be ready to rock tomorrow." [Call 66].

21. On August 18, 2003, McCarthy called Walter on his cellular telephone at 5:06 p.m. [call 1364]. McCarthy addressed meeting with Walter, and Walter said that Max had been with him all day. Walter said that he would "whack out a couple" for McCarthy if McCarthy would "keep him amused." Walter then told McCarthy that they would "meet at mom's." I understood this to

mean that Walter would put together a package of marijuana at 25 Royal Road for McCarthy if McCarthy would watch Walter's son while Walter was preparing the package.  McCarthy responded that "I'll take him out for an ice cream."

22.  At 7:15 p.m. on August 18, 2003, Walter called McCarthy from his landline [Call 115] and stated that he was "heading over to mum's."  McCarthy responded that he would see him in a couple of minutes.  I understood this to be a follow up to the earlier calls arranging to meet at 25 Royal Road.

23.  Surveillance units saw Walter, McCarthy and Walter's son Max at 25 Royal Road that evening.

### September 3, 2003 Call to Francis Duggan

24.  On September 3, 2003, Kurt Walter called Francis Duggan, one of his marijuana customers.  During the conversation, Kurt Walter indicated that he had to travel to a different location than his mother's house (25 Royal Road) to get marijuana for Duggan.  Specifically, Kurt Walter told Duggan he had to "take a ride" because his "you know my mom's house is gone now. You know what I mean?"  Duggan indicated that he understood. Kurt Walter further stated that he didn't have "the way I used to."  Duggan asked Walter to do the best he could, but then said that he was "dying over here."  "I've got nothing to smoke, nothing to sell.  I'm in agony."  Kurt Walter told Duggan to "Watch the phone."  Walter then stated:  "I think you should do a

deuce anyway. You know. That way you'll be good for a while." I understand that in this conversation, Kurt Walter and Duggan were discussing obtaining marijuana for Duggan. Kurt Walter's statement that his "mom's house is gone now," and that he didn't "have the way I used to," refers to how Kurt Walter was unable to use 25 Royal Road as a stash location for marijuana any longer because it is on the market for sale.

    25.  On September 23, 2003, at 12:07 p.m., Kurt Walter called Dan MacAuley, one of his marijuana customers, from his landline, Target Telephone 2 [call 1945]. Walter and Macauley discussed the last time they met in order to give Kurt Walter marijuana proceeds. Walter asked Macauley, "When was the last day you met me?" "Was the last time you met me, right, to give me something, right, what was it?" MacAuley could not remember, but replied, making reference to delivering marijuana proceeds to Walter, "It was a large one," and that "it was at your mother's house, in the kitchen." Kurt Walter recalled that the day was "8/30." Kurt Walter also stated, "that was a big one at my mom's" and that he did not see MacAuley again until "9/17." Kurt Walter stated that he "has all those figures down." They agreed to meet at 1:30 at the Dunkin' Donuts near Wollaston Boulevard. Like the majority of the intercepted telephone calls between Kurt Walter and his marijuana associates, in this call Kurt Walter and MacAuley used cryptic language to discuss their marijuana

12

transactions.  In this conversation, Kurt Walter and MacAuley discussed the last time MacAuley met Walter to give him marijuana proceeds.  MacAuley's and Walter's references to "a large one" and "a big one" at Walter's mother's house refer to MacAuley giving Kurt Walter a large amount of marijuana proceeds at Kurt Walter's mother's house, 25 Royal Road, on August 30.

### September 12 -15 calls with Daniel MacAuley

26.  Beginning on September 12, 2003, there were a series of calls and/or voicemail messages between Walter and MacAuley on Target Telephone 1 in which MacAuley indicated that he wanted to meet with Walter.  On September 13th (Call 2788), MacAuley wanted to know if they could get together.  Walter indicated that he had "work" for him.  The following day, September 14th (Call 2831), MacAuley left a message for Walter that he was going to be busy the following day and that he was hoping that they "can make this happen" that day.  Later the same day (Call 2843), MacAuley left another message for Walter.  He said that he was "looking bad" and asked Walter to give him a call.

27.  The next morning, September 15th (Call 2852), MacAuley left another message for Walter asking him to call him and that he could go right over (to meet Walter).  Later that day, at approximately 11:20 a.m., Walter and MacAuley spoke live (Call 2859).  In this call, Walter told MacAuley that he could meet him that day, but he was at work (presumably, working on the

13

restaurant at 10 Langley Road) and that people were "showing the house." I understood this to mean that 25 Royal Road, his late mother's residence and his stash house for marijuana, was being shown to potential buyers so he wouldn't be able to get in there until later. MacAuley replied that he "didn't come prepared." I understood this to mean that he did not have drug proceeds to pay Walter. Walter told him not to worry about it and that they would figure it out the following day. They agreed to meet a little after 4 p.m. In an intercepted call at approximately 4:59 p.m., (Call 2868), Walter and MacAuley agreed to meet at Walter's house in one half hour. A short time later, surveillance observed Walter park his vehicle in front of 25 Royal Road and go inside the residence. At approximately 5:11 p.m., Walter emerged from the residence, placed an item in his trunk and then drove to the garage to 30 Gardner Road. Walter was seen then driving from the garage and then returning at approximately 5:38 p.m. At approximately 5:51 p.m., MacAuley was observed parking his vehicle in front of 30 Gardner Road. Before entering the apartment building, he opened his trunk, looked inside and then closed it. At approximately 6:09 p.m., MacAuley exited 30 Gardner Road carrying a yellow plastic bag. He then departed the area in his vehicle. Based upon the intercepted calls and surveillance, I believe that MacAuley picked up a quantity of marijuana from Walter after Walter picked up the marijuana from

25 Royal Road.

**Melissa and Kurt Walter discuss the drugs and drug-related items stored at 25 Royal Road.**

28.  In September 2003, Melissa and Kurt Walter had a number of conversations about the drugs and drug-related items stored at 25 Royal Road.  In particular, Melissa Walter repeatedly expressed her concern that realtors or potential buyers touring 25 Royal Road might discover evidence of drug trafficking at the house.

29.  On September 20, 2003, call 1846, Melissa Walter left a voicemail message on Kurt Walter's phone, stating that she was "at Mum's," that is, 25 Royal Road.  Melissa Walter informed her brother, "Listen, we were going through the basement and we found all these little moist buds of pot.  So Cort,[1] you cannot have pot up here anymore.  You know because the realtor is gonna be coming through here a lot."  She concluded the call by saying "no more dope and no parties and no hanging out up he[re] anymore."

30.  In a telephone conversation the following day, September 21, 2003, at 4:39 p.m. [call 3149], Melissa Walter reminded her brother that potential buyers would be visiting 25 Royal Road and told him to remove the evidence of narcotics trafficking.

> MELISSA:  I'm, you need to get that digital scale out of Mum's house okay.

---

[1]  "Cort" is Kurt Walter's nickname.

    KURT:      Yeah

    MELISSA:   And you can't be doing that in the house.

    KURT:      Melissa that thing has been there for a while.

    MELISSA:   Well Cort it was covered with weed. So I don't know how long a while is in your book, okay?

    KURT:      Yeah

    MELISSA:   And we wiped it off so.

    KURT:      Okay

    MELISSA:   You gotta get that out of there and there was just tons of buds all over the floor

    KURT:      Okay.

From this conversation, I conclude that Melissa Walter was telling Kurt Walter to take the scale out of the house because it was obvious that the scale was used for weighing quantities of marijuana. I also understood the reference to "buds" to refer to buds of marijuana.    31.  I have examined the scale that was recovered from 25 Royal Road, and it still contains residue of a green vegetable substance. Based on my experience, I believe that the substance visible on the scale today is marijuana.

### October 21, 2003 Meeting with Dan MacAuley

32.  On October 20, 2003, at 2:36 p.m., Walter called Daniel MacAuley from his cellular telephone, Target Telephone 1, and told MacAuley that he had "those things for you." [Call 4507].

16

In subsequent calls, they agreed to meet the following day.

33.  A call on October 21, 2003 at approximately 3:45 p.m. indicated that MacAuley was "on 128."  Walter told him to "come by." (Call 4558).  Later that day, surveillance observed Walter arrive and park at 25 Royal Road, Brookline.  A short time later, Walter drove toward and entered the garage to his residence at 30 Gardner Road, Brookline.

### October 22, 2003 Call from Kim Frank

34.  On October 22, 2003, Frank called Walter and indicated that she had approximately "3200" papers for him to sign (meaning she had $3,200 in drug proceeds for Walter).  (Call 4586).  In a call at approximately 4:52 p.m. (Call 2981), Frank confirmed that "I'm supposed to meet you at your house not mum's house, right?"  I understood this to mean that she had previously met him at 25 Royal Road, Brookline.

35.  A short time after this call occurred, surveillance observed a taxi arrive and a white female with curly blond hair get out and enter 30 Gardner Street carrying a white plastic bag.  At approximately 5:48 p.m., a woman identifying herself as "Kim" using Walter's landline, Target Telephone 2 (Call 2991), called the Red Cab taxi service and requested a cab to pick her up at 30 Gardner Road.  At approximately 6:04 p.m., surveillance observed a taxi pull up in front of 30 Gardner Road.

Signed under the pains and penalties of perjury this <u>15th</u> day of August, 2007.

<u>/s/ Brian Tomasetta</u><br>
Brian Tomasetta<br>
Special Agent, Drug<br>
Enforcement Administration