UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
UNITED STATES OF AMERICA,        )
            Plaintiff,           )
                                 )
    v.                           )  Civil Action No. 04-10191-DPW
                                 )
25 ROYAL ROAD, BROOKLINE,        )
MASSACHUSETTS,                   )
            Defendant.           )
                                 )
_____)
KURT WALTER,                     )
            Claimant.            )
```

## AFFIDAVIT OF MICHELLE COPPOLA

I, Michelle Coppola, being duly sworn, depose and state as follows:

1. In approximately September 2001, I visited family in Oregon. During this visit, my cousin told me that he was making money distributing marijuana, and he suggested that I could do the same. He provided me with approximately twenty-five pounds of marijuana to distribute on the east coast.

2. At the time, I did not know anyone to sell the marijuana to. I knew Kurt Walter ("Cort") through a mutual friend, and I knew that Cort was a marijuana supplier. I contacted Cort, and he agreed to purchase the marijuana from me.

3. From that time until approximately January 2003, I acquired marijuana from my cousin about every six weeks and sold it to Cort. I would estimate that I supplied him marijuana about eight times over the next year, in quantities that ranged from twenty-five to fifty pounds. I also gradually

      learned of other persons to sell the marijuana to.

4. In January 2003, my cousin was stopped by the New York State Police on his way to Massachusetts, and the police seized marijuana that he was traveling with. Although he was not arrested right then, my cousin stopped supplying me with marijuana.

5. Cort called me in January 2003 looking for marijuana. I did not tell Cort that my cousin had been stopped by the police, but I told him that my source was not happy with the quality of marijuana available and that he was having trouble with his drivers. I told him that one of the drivers had been stopped by police, although he was not arrested, and another driver had recently gotten married and then decided he did not want to take the risk of driving marijuana any more.

6. Cort told me that he could supply me with marijuana. In February 2003, I had a customer, "Rob," who wanted to buy fifty pounds. Cort fronted me sixty pounds of marijuana. I fronted Rob two pounds of marijuana, and two days later he took more. However, he only took twenty-three pounds because he was unhappy with the quality. I asked Cort to take the remaining thirty-five pounds back, but he told me to try to sell it. I told Cort that I had one customer, Mohamed Ash-Fouad, whom we referred to as "Alex" or "the Egyptian," who would take twenty-five pounds but was sometimes slow to pay. Cort agreed that I should front the

marijuana to Ash-Fouad. Ash-Fouad ultimately refused to pay for the marijuana, and Cort took over the collection of the money from him.

7. I gave out the remaining ten pounds that Cort had fronted me in small quantities to local customers, and therefore owed Cort $7,000 for this amount.

8. From February 2003 through May 2003, Cort provided me with marijuana, despite the ongoing debt for the February purchase. He gave me four to five pounds in April 2003, and I paid him for this in May 2003. However, none of this went to the February debt. He reminded me that he was fronting me marijuana so that I could pay off the $7,000 that I still owed him.

9. When I spoke with Cort over the telephone, he was always careful in the way in which he spoke so that it would not be apparent that we were referring to marijuana. For example, I would tell Cort that I needed a guy to work on a ten hour construction project. This would mean that I needed ten pounds of marijuana. Cort would tell me the price per pound as the "pay per hour" for the "worker." When I had money for Cort as payment, I told him that I had a report to pick up. The number of pages in the report referred to the number of pounds that I was ready to pay for.

10. During the months that Cort was providing me with marijuana, he usually brought the marijuana to me at my

house. I understood that he stored his marijuana at his mother's house. I inferred this from the things he would say when we were arranging a time that he would bring the marijuana to me. Cort would generally talk through his schedule when we were arranging a meeting, as if he was thinking out loud. Cort's mother was still living at the time, but he would say things like, "I can't go by my mom's right now because she's there" or "I can't go by my mom's right now because I've got my kid" or "I'll go by my mom's and then I'll come to your place." The way that I understood it, he needed to stop by his mother's house before he met me, because that was where he was storing the quantities of marijuana that we were dealing in. He would make arrangements to stop by there when his mother was not there and when he did not have his son because he did not want them to be present during drug transactions. I estimate that he said things like this a handful of times when I was obtaining marijuana from him.

11. In May 2003, Cort gave me 6-1/2 pounds of high grade marijuana. I had sold part of that marijuana and collected the money for it when I was approached by special agents from the United States Drug Enforcement Administration (DEA) on May 13, 2003. They told me they had a search warrant for my home, that I would likely be indicted in an investigation in Oregon, where my cousin lived, and they asked me to cooperate with their drug investigation. I

agreed to cooperate.

12. Over the course of the next several months, I continued to speak with and meet Cort regarding the marijuana business. I had meetings with him to pay off the debt that I owed him and I also picked up more marijuana from him. However, during this time period, all of my calls and meetings were monitored by DEA; the money was provided by DEA; and the marijuana that I received from Cort was turned over to DEA.

13. One of these meetings took place on September 16, 2003. Prior to the meeting, I had had telephone calls with Cort in which he agreed to provide me with about two pounds of marijuana, as well as a sample of a low grade marijuana. We agreed to meet at the Barnes and Noble Bookstore at on Route 9 in Brookline, at about 5:00 p.m. Immediately before meeting Cort, I was searched for contraband and cash by state Trooper Marion Fletcher. I had none. I met Cort in the bookstore at about 5:00 p.m. in the Starbucks Café section. During the meeting, Cort provided me with the marijuana in a red and black colored shopping bag. After I left Cort, I gave this bag to Special Agent Barton. I was again searched for cash and contraband by Trooper Fletcher and I had none.

14. I also met with Cort on September 29, 2003 and spoke to him about purchasing marijuana. I have reviewed an audio recording of a meeting I had with Cort on that day and I recognize on the recording my voice and the voice of Cort.

   I have reviewed a three page transcript of the first part of that conversation. This transcript, attached hereto as Exhibit 1, is a fair and accurate transcript of the first portion of that meeting with Cort on September 29, 2003.

15. During the meeting, I showed Cort a trunk that he wanted to use to store marijuana. He told me that he was going to be using a storage place nearer my house because he could no longer store the marijuana at his mother's place, since his mother's house was on the market.

Signed this 24th day of July under pains and penalties of perjury.

                                        Michelle Coppola
                                        *Michelle Coppola*